UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 04230

| | |
|---|---|
| NASSER BAKIZADA, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFF, <br> V. <br><br> BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BARCLAYS BANK PLC, BARCLAYS CAPITAL, INC., BNP PARIBAS GROUP, BNP PARIBAS NORTH AMERICA, INC., BNP PARIBAS PRIME BROKERAGE, INC., BNP PARIBAS SECURITIES, INC., CITIGROUP, INC., CITIBANK, N.A., CITIGROUP GLOBAL MARKETS, INC., CREDIT SUISSE GROUP AP, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., THE GOLDMAN SACHS GROUP, INC., GOLDMAN, SACHS & CO., HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC NORTH AMERICA HOLDINGS INC., HSBC BANK USA, N.A., HSBC SECURITIES (USA) INC., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, N.A., MORGAN STANLEY, MORGAN STANLEY & CO., LLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES INC., UBS AG, AND UBS SECURITIES LLC, <br><br> DEFENDANTS. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> <br><br><br>  |

Plaintiff Nasser Bakizada ("Plaintiff"), individually and on behalf of a class of all others similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants and demands a jury trial.

## NATURE OF THE ACTION

1.      Plaintiff alleges that Defendants, in violation of Section 1 of the Sherman Act, and multiple sections of the Commodity Exchange Act conspired to intentionally manipulate prices for foreign exchange ("FX") futures and options on FX futures.  FX futures are agreements to buy or sell a foreign currency at a set price and date in the future, and are traded on centralized exchanges, such as the Chicago Mercantile Exchange ("CME") and ICE Futures U.S. Exchanges ("ICE").   Defendants colluded to "bang the close," "take out the filth," "overbuy," and engage in a variety of other manipulative tactics—essentially, artificially pushing through favorable transactions, while withholding unfavorable ones—during periods of time when important benchmarks were being measured.  The intended result of this concerted action was that FX prices, including for futures and options and futures, were distorted in Defendants' favor. Caught in the wake of Defendants' scheme were those that traded futures during the periods when the markets were being so distorted.

2.      Defendants, who together dominate the FX market, essentially admitted to colluding to manipulate FX prices.  All the hallmarks of manipulation—price fixing, direct communications between competitors, sharing of commercially sensitive information (like client orders), and a resulting concerted course of activity designed to result in price movements favorable to conspiracy members—were revealed by government and other investigations.  In fact, through fines and now proposed class-action settlements, many Defendants are currently paying for their admitted sins.

2

3.       However, the scope and impact of Defendants' schemes has now been revealed to be wider than what many may have previously understood, for at least two reasons.

4.       First, this is because the focus, until now, has been on prices for "spot" transactions (where the currencies are exchanged almost immediately).  This is likely because initial reports about wrongdoing centered around 4 p.m. London time, when benchmarks used for spot transactions (the "WM/Reuters Closing Rates") were set.  But this focus understates the scope of Defendants' scheme as prices for FX *futures*—contracts to buy and sell currency at a pre-set time in the future, usually at the end of the quarter—move in tandem with FX spot prices.

5.       Thus, a large class of victims of Defendants' admitted-to manipulations in the FX marketplace have yet to be compensated, either by fines or even the previously announced settlements with *spot* participants:  those who transacted in FX *futures and options on futures* around the WM/Reuters Closing Rate fixing window.  Prices for FX futures around that time moved at the whim of Defendants' admitted-to "cartel" no less than spot prices did.  Those that transacted in FX futures and options on futures are thus no less the victims of Defendants' schemes, than those that executed spot transactions.

6.       Second, there is reason to believe that Defendants' "cartel" did not restrict its manipulation to one specific window, but rather manipulated prices at other key times as well.

7.       For instance, every trading day, FX futures are "marked to market," and traders' accounts credited or debited accordingly, based on the average trading activity on the futures transactions for each currency pair during a thirty-second window leading up to 2 p.m. Central time (the "CME Daily Settlement Rates").[1]  Further, this rate is used to make the key determination of whether options on FX futures on each currency pair are "in the money" or

---

[1] The ICE futures exchange also uses prices around 2 p.m. Central time to perform similar calculations.

"out of the money." Defendants, who maintained huge books of FX futures and options on

futures, thus would have just as keen of an interest in this FX benchmark, as they admitted to

having in the WM/Reuters benchmark.

8.     Given Defendants' admitted-to practice of collectively and collusively flooding

the FX market with transactions during key measurement windows, it is not surprising to see

huge spikes in futures activity centering around 2 p.m. Central time, just as was seen around 4

p.m. London time.  Indeed, the market activity around the CME Daily Settlement Rate fixing

window is often higher than that around the WM/Reuters Closing Rate fixing window, where

many Defendants have admitted to "banging the close."   Other key trading times, such as on the

quarterly periods when FX futures were typically rolled over, or had their final settlement prices

calculated, were also vulnerable to Defendants' manipulation.

9.     Plaintiff, who traded FX futures, including on days already identified as being

those on which prices show particularly strong signs of having been manipulated, and including

around the relevant trading time windows, was a victim of Defendants' cartel, and brings this

Complaint to seek redress.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 1337(a), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and

Section 22 of the Commodity Exchange Act (7 U.S.C. § 25).

11.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28

U.S.C § 1391(b), (c), and (d) because during the Class Period (as defined below), all the

Defendants resided, transacted business, were found, or had agents in this District; a substantial

part of the events or omissions giving rise to these claims occurred in this District; and a

4

substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

        12.    This Court has personal jurisdiction over each Defendant, because each Defendant:  transacted business throughout the United States, including in this District; entered FX transactions, including spot, forward, futures and options transactions, throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

        13.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## THE PARTIES

### A.    Plaintiff

        14.    Plaintiff Nasser Bakizada is an individual residing in Washington, D.C.  He traded extensively in the FX market. This included entering into approximately thousands of FX futures trades from 2008 through 2011, as well as other times during the Class Period, including on days that have already been identified as those showing particular signs of having been subject to Defendants' FX manipulations alleged herein. He often entered into FX futures trades during the trading windows at issue in this Complaint, such as those around the daily WM/Reuters Closing Rate fixing window, the CME Daily Settlement Rate fixing window,

and/or around the quarterly industry-standard rollover and final settlement calculation windows.[2]  Mr. Bakizada was harmed by Defendants' wrongful acts alleged herein.

**B.    Defendants**

15.    Whenever in this Complaint reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

16.    UBS Defendants.  Defendant UBS AG is a financial institution organized and existing under the laws of Switzerland, with its principal places of business in Basel and Zurich, Switzerland. UBS AG engages in substantial activities in the U.S., including in New York. UBS AG has branches and representative offices throughout the U.S., including in New York. UBS AG has its U.S. headquarters, and thousands of employees, in New York, New York.

17.    UBS Securities LLC ("UBS Securities") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York. UBS Securities is an indirect wholly owned subsidiary of UBS AG.  UBS Securities is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "UBS" includes Defendants UBS AG, UBS Securities, and their subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

18.    During the Class Period, UBS was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, in a Resolution Plan filed with the Federal Reserve,

_____
[2] Because Mr. Bakizada entered into such a large quantity of FX trades, they have not been attached to this complaint, but can be provided upon request.

UBS listed its foreign exchange franchise as a "core business line," and confirmed that the bank's FX contracts "include spot, forward and cross-currency swaps and options and warrants."[3]   UBS also consistently appears toward the top of Euromoney's surveys of the top participants in the global FX market. In its Report on UBS's manipulation of the FX market, FINMA stated that UBS was one of the banks that "dominated" the FX market, with an average market share of 8.9% between 2010 and 2013.  And as noted above, UBS Securities is a registered futures merchant and a clearing member of the CME.

19.     As detailed below, government regulators have specifically targeted UBS as part of their ongoing investigations into the manipulation of the FX market. The CFTC, FCA, and FINMA have each already concluded that UBS colluded with others banks to manipulate the FX market. UBS has since suspended or terminated at least nine FX employees, and banned the use of multi-bank chat rooms by its FX personnel.

20.     Upon information and belief, UBS traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

21.     Deutsche Bank Defendants.  Defendant Deutsche Bank AG is a financial services company organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Deutsche Bank AG has substantial operations in the U.S., including in New York. Deutsche Bank AG has a regional branch office in New York, New York, which is licensed through the New York Financial Services Division, and is regulated by the Federal Reserve and the CFTC as a registered swap dealer. Deutsche Bank has described its New York branch as a Material Entity, which is defined as "significant to the activities of a core business

---

[3] 2014 UBS US Resolution Plan (Jul. 2014) (available at http://www.federalreserve. gov/bankinforeg/resolution-plans/ubs-1g-20140701.pdf).

line or critical operation."[4]  The New York branch "engag[es] primarily in traditional lending and deposit activities, as well as trading activities dealing with derivatives . . . and cash financial products."

22.    Deutsche Bank Securities Inc. ("DBSI") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York. DBSI is an indirect wholly owned subsidiary of Deutsche Bank AG. DBSI is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "Deutsche Bank" includes Defendant Deutsche Bank AG, DBSI, and their subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

23.    During the Class Period, Deutsche Bank was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, in a Resolution Plan filed with the Federal Reserve, Deutsche Bank designated FX trading as a "Core business line," and explained that it "engages in all aspects of the foreign exchange business, including in standard spot, FX derivatives, and forward markets and electronic trading."[5]  In addition, Deutsche Bank consistently appears at the top spot on Euromoney's surveys of the top participants in the global FX market. And as noted above, DBSI is a registered futures merchant and a clearing member of the CME.

24.    As detailed below, government regulators have specifically targeted Deutsche Bank as part of their ongoing investigations into the manipulation of the FX market. Deutsche

---

[4] Deutsche Bank U.S. Resolution Plan, July 2014 Submission, at 4 (Jul. 1, 2014) (available at http://www.federalreserve.gov/bankinforeg/resolution-plans/deutsche-bank-1g-20140701.pdf).

[5] Deutsche Bank U.S. Resolution Plan (Jul. 1, 2014) (available at http://www.federalreserve.gov/bankinforeg/resolution-plans/deutsche-bank-1g-20140701.pdf).

Bank has since suspended or terminated at least five FX employees, overseen the departure of
other key personnel, and banned the use of multi-bank chat rooms by its FX personnel.

25.     Upon information and belief, Deutsche Bank traded FX futures contracts at
manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

26.     Barclays Defendants.  Defendant Barclays Bank plc ("Barclays Bank") is a
United Kingdom public limited company headquartered at 1 Churchill Place,  London E14 5H,
England. Barclays Bank has substantial operations in the U.S., including in New York.
Barclays Bank has branches and representative offices throughout the U.S., including locations
and employees in New York, New York.  In addition, Barclays Bank is registered as a financial
holding company with the Federal Reserve Bank of New York, and Barclays Banks' New York
branch is licensed by the New York State Department of Financial Services with a registered
address in New York, New York.

27.     Defendant Barclays Capital, Inc. ("BarCap") is a corporation organized and
existing under the laws of Connecticut.  BarCap maintains an office in this District at 200 Park
Avenue, New York, NY10166.  It has been registered with the CFTC as a Futures Commission
Merchant since 1990, an approved Exempt Foreign agent since 1992, and a Commodity Pool
Operator and Commodity Trading Advisor since 2009.  BarCap is also registered as a broker-
dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm
member of CME Clearing. BarCap is a subsidiary of Barclays Bank.  BarCap engages in
investment banking and investment management services. As used herein, the term "Barclays"
includes Defendants Barclays Bank, BarCap, and their subsidiaries and affiliates that bought,
sold, settled, or otherwise transacted in FX instruments during the Class Period.

28.     During the Class Period, Barclays was a major participant in the market for FX instruments (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions.

29.     As detailed below, government regulators have specifically targeted Barclays as part of their ongoing investigations into the manipulation of the FX market. Barclays has since suspended or terminated at least six FX employees, and banned the use of multi-bank chat rooms by its FX personnel.

30.     Upon information and belief, Barclays traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

31.     Bank of America Defendants.  Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of Delaware with its principal place of business in Charlotte, North Carolina. BAC has extensive operations in New York, including its investment banking division, which is located in New York, New York.  Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina. BANA is a wholly owned subsidiary of BAC, and has extensive operations in New York.

32.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPFS") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  MLPFS is the successor (by merger) to Banc of America Securities LLC, and is a wholly owned subsidiary of BAC.  MLPFS is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing, which is the clearing house division of the CME. As used herein, the

term "BofA" includes Defendants BAC, BANA, MLPFS, and their subsidiaries and affiliates

that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

33.     During the Class Period, BofA was a major participant in the FX market

(including by transacting in spots, forwards, futures, and options) and a major dealer for FX spot

and forward transactions. For instance, the Office of the Comptroller of the Currency ("OCC")

observed that BofA "engages in foreign exchange business (including G10 and other currencies,

sales and trading in spot, forwards, options, and other derivatives)" and that BofA "was an

active dealer in the G10 spot foreign exchange market during the period from 2008 to 2013."[6]

BofA also consistently appears on Euromoney's surveys of the top participants in the global FX

market. And as noted above, MLPFS is a registered futures merchant and a clearing member of

the CME.

34.     As detailed below, government regulators have specifically targeted BofA as part

of their ongoing investigations into the manipulation of the FX market. The OCC, for instance,

has already concluded that BofA colluded with others banks to manipulate the FX market. BofA

has since suspended or terminated at least one FX employee, and banned the use of multi-bank

chat rooms by its FX personnel.

35.     Upon information and belief, BofA traded FX futures contracts at manipulated

prices not reflecting fundamental supply and demand, to their direct benefit.

36.     BNP Paribas Defendants.  Defendant BNP Paribas Group ("BNP Group") is a

French bank and financial services company headquartered in Paris, France at 16, Boulevard des

Italiens Paris, 75009 France.  BNP Group has branches and representative offices throughout the

U.S., including locations and employees in New York, New York.  BNP Paribas Group

---

[6] *In the Matter of Bank of America, N.A.*, AA-EC-14-99, Consent Order (Nov. 11, 2014).

maintain an office in this District at 787 Seventh Avenue, New York, NY 10019.  In addition,

BNP Group is licensed by the New York Department of Financial Services, with a registered

address in New York, New York.  Defendant BNP Paribas North America Inc. ("BNPNA") is a

corporation organized and existing under the laws of Delaware with its principal place of

business in New York, New York.  BNPNA engages in investment banking and securities

brokerage activities, and is an affiliate of BNP Group.

   37. BNP Paribas Prime Brokerage, Inc. ("BNPPB") is a corporation organized and

existing under the laws of Delaware with its principal place of business in New York, New

York. BNPPB is a wholly-owned subsidiary of BNPNA.  BNPPB is registered as a broker-

dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm

member of CME Clearing. BNP Paribas Securities Corp. ("BNPS") is a corporation organized

and existing under the laws of Delaware with its principal place of business in New York, New

York.  BNPS is a wholly-owned subsidiary of BNPNA.  BNPS is registered as a broker-dealer

with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of

CME Clearing. As used herein, the term "BNP Paribas" includes Defendants BNP Group,

BNPNA, BNPPB, BNPS, and their subsidiaries and affiliates that bought, sold, settled, or

otherwise transacted in FX instruments during the Class Period.

   38. During the Class Period, BNP Paribas was a major participant in the FX market

(including by transacting in spots, forwards, futures, and options), and a major dealer for FX

spot and forward transactions. And as noted above, BNPPB and BNPS are registered futures

merchants and clearing members of the CME.

   39. As detailed below, government regulators have specifically targeted BNP Paribas

as part of their ongoing investigations into the manipulation of the FX market. BNP Paribas has

since suspended or terminated at least one foreign exchange employee, and banned the use of multi-bank chat rooms by its FX personnel.

40.     Upon information and belief, BNP Paribas traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

41.     Citi Defendants.  Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation headquartered at 399 Park Avenue, New York, New York 10043.  Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association headquartered at 701 East 60th Street North, Sioux Falls, SD 57104, with its principal place of business in New York, New York. Citibank is a wholly owned subsidiary of Citigroup. Defendant Citigroup Global Markets Inc. ("CGMI") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.  CGMI is a wholly owned subsidiary of Citigroup. CGMI is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "Citi" includes Defendants Citigroup, Citibank, CGMI, and their subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

42.     During the Class Period, Citi was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For example, in its 2013 Annual Report, Citigroup touted its ranking as "Best FX Bank" in various industry publications.[7] And in a Resolution Plan filed with the FDIC, Citigroup and Citibank listed as a "core business line" its FX operations, which

---

[7] Citigroup Inc. 2013 Annual Report (available at http://www.citigroup.com/citi/ investor/quarterly/2014/annual-report/).

"include[s] foreign exchange spot, forwards and derivatives."8 Citi also consistently appears toward the top of Euromoney's surveys of the top participants in the global FX market. And in its Consent Orders on Citi, the OCC observed that Citi "engages in foreign exchange business (including G10 and other currencies, sales and trading in spot, forwards, options, or other derivatives)" and "was an active dealer in G10 spot foreign exchange market." In addition, as noted above, CGMI is a registered futures merchant and a clearing member of the CME.

43.     As detailed below, government regulators have specifically targeted Citi as part of their ongoing investigations into the manipulation of the FX market. The CFTC and FCA have already concluded that Citi colluded with other banks to manipulate the FX market. Citi has since suspended or terminated at least three foreign exchange employees, and banned the use of multi-bank chat rooms by its FX personnel.

44.     Upon information and belief, Citi traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

45.     Credit Suisse Defendants.  Defendant Credit Suisse Group AG ("CSGAG") is a financial holding company organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. CSGAG has substantial operations in the U.S., including in New York.  CSGAG is licensed by the New York Department of Financial Services with a registered address in New York, New York.

46.     Defendant Credit Suisse AG ("CSAG") is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. CSAG is a wholly owned subsidiary of CSGAG.  CSAG has substantial operations in the U.S., including in New York.  CSAG has a major branch and thousands of employees in New York, and is

---

8 Resolution Plan for Citigroup Inc. & Citibank, N.A. (Jun. 29, 2012) (available at https://www.fdic.gov/regulations/reform/resplans/plans/citi-1207.pdf).

licensed by the New York Department of Financial Services with a registered address in New

York, New York. In addition, CSAG is subject to regulation by the Federal Reserve Bank of

New York, as a "covered bank" under Dodd-Frank.

47.     Defendant Credit Suisse Securities (USA) LLC ("CSS") is a limited liability

company organized and existing under the laws of Delaware, with its principal place of business

in New York, New York.  CSS is a wholly owned subsidiary of CSGAG.  CSS is registered as a

broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing

firm member of CME Clearing. CSS is also registered with FINRA.  Defendant Credit Suisse

International ("CSI") is a bank with its principal place of business in the U.K.  CSI is a wholly

owned subsidiary of CSGAG, and is a clearing member of CME Clearing. As used herein, the

term "Credit Suisse" includes Defendants CSGAG, CSAG, CSS, CSI, and their subsidiaries and

affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class

Period.

48.     During the Class Period, Credit Suisse was a major participant in the FX market

(including by transacting in spots, forwards, futures, and options), and a major dealer for FX

spot and forward transactions. For instance, in a Resolution Plan filed with the Federal Reserve,

Credit Suisse stated that its "most frequently used freestanding derivative products, entered into

for trading and risk management purposes, include interest rate, credit default and cross-

currency swaps, interest rate and foreign exchange options, foreign exchange forward contracts

and foreign exchange and interest rate futures."9  Similarly, in its 2013 Annual Report, Credit

Suisse stated that its FX business includes "market making in products such as spot and

---

 9 Credit Suisse Global Recovery and Resolution Plan (Jun. 30, 2014) (available at
http://www.federalreserve.gov/bankinforeg/resolution-plans/credit-suisse-1g-20140701.pdf).

options."[10]  In addition, Credit Suisse consistently appears on Euromoney's surveys of the top participants in the global FX market. And as noted above, CSS and CSI are registered futures merchants and clearing members of the CME.

49.     As detailed below, government regulators have specifically targeted Credit Suisse as part of their ongoing investigations into the manipulation of the FX market. Credit Suisse has since substantially scaled back its FX trading operations, and banned the use of multi-bank chat rooms by its FX personnel.

50.     Upon information and belief, Credit Suisse traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

51.     Goldman Sachs Defendants.  Defendant The Goldman Sachs Group, Inc. ("GSG") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  GSG is a bank holding company and a financial holding company. Defendant Goldman, Sachs & Co. ("GSC") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York. GSC is a wholly owned subsidiary of GSG, and is the principal operating subsidiary of GSG. GSC is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "Goldman Sachs" includes Defendants GSG, GSC, and their subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

52.     During the Class Period, Goldman Sachs was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, in a Resolution Plan filed with the Federal

---

[10] Credit Suisse 2013 Annual Report, filed on Form 20-F (available at https://www.credit-suisse.com/media/cc/docs/investors/z-20f-2013.pdf).

Reserve, Goldman Sachs disclosed that it regularly uses futures, forwards, swaps, and options to "manage foreign currency exposure," and described its operating entity J. Aron & Company as a "foreign exchange market maker."11  Goldman Sachs also consistently appears on Euromoney's surveys of the top participants in the global FX market. And as noted above, GSC is a registered futures merchant and a clearing member of the CME.

53.     As detailed below, government regulators have specifically targeted Goldman Sachs as part of their ongoing investigations into the manipulation of the FX market. Goldman Sachs has since overseen the departure of at least three senior FX executives, and banned the use of multi-bank chat rooms by its FX personnel.

54.     Upon information and belief, Goldman Sachs traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

55.     HSBC Defendants.  Defendant HSBC Holdings plc ("HSBC Holdings") is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England. HSBC Holdings and its subsidiaries have substantial operations in the U.S., including in New York.  Defendant HSBC Bank plc ("HSBC Bank") is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England. HSBC Bank is a wholly owned subsidiary of HSBC Holdings. HSBC Bank and its subsidiaries have substantial banking operations in the U.S., including in New York.

56.     Defendant HSBC North America Holdings Inc. ("HSBC North America") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  HSBC North America is a wholly owned subsidiary of

---

[11] The Goldman Sachs Group, Inc. Global Resolution Plan (Jun. 27, 2014) (available at http://www.federalreserve.gov/bankinforeg/resolution-plans/goldman-sachs-1g-20140701.pdf).

Defendant HSBC Holdings, and is the holding company for HSBC Holdings' operations in the U.S.  Defendant HSBC Bank USA, N.A. ("HSBC Bank USA") is a federally chartered national banking association with its principal place of business in McLean, Virginia. HSBC Bank USA is a wholly owned subsidiary of Defendant HSBC Holdings. HSBC Bank USA has its principal executive office in New York, New York, and has branch offices throughout New York.

57.     Defendant HSBC Securities (USA) Inc. ("HSBC Securities") is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  HSBC Securities is an indirect wholly owned subsidiary of HSBC Holdings. HSBC Securities is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "HSBC" includes Defendants HSBC Holdings, HSBC Bank, HSBC North America, HSBC Bank USA, HSBC Securities, and their subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

58.     During the Class Period, HSBC was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, in a Resolution Plan filed with the Federal Reserve, HSBC described as its foreign exchange operations as a "core business line" that "provides services in foreign exchange (FX) spot, forwards, swaps and other related derivatives."[12] HSBC also consistently appears on Euromoney's surveys of the top participants in the global FX market.  And as noted above, HSBC Securities is a registered futures merchant and a clearing member of the CME.

---

[12] HSBC Holdings plc US Resolution Plan (Jul. 1, 2014) (available at http://www.federalreserve.gov/bankinforeg/resolution-plans/hsbc-2g-20140701.pdf).

59.     As detailed below, government regulators have specifically targeted HSBC as part of their ongoing investigations into the manipulation of the FX market. The CFTC and FCA have already concluded that HSBC colluded with others banks to manipulate the FX market. HSBC has since suspended or terminated at least two FX employees, and banned the use of multi-bank chat rooms by its FX personnel.

60.     Upon information and belief, HSBC traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

61.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a Delaware financial holding company headquartered in this District at 270 Park Ave., 38th Floor, New York, NY 10017.  On May 29, 2008, JPMC merged with Bear Stearns & Co., assuming its assets and liabilities. Before the acquisition, Bear Stearns & Co. was a foreign exchange dealer and acted as a counterparty in foreign exchange transactions.

62.     Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB") is a federally chartered national banking association with its principal place of business in New York, New York. JPMCB is a wholly owned subsidiary of JPMC.  Defendant J.P. Morgan Securities LLC ("JPMS") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  JPMS and is an indirect wholly owned subsidiary of JPMC. JPMS is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "JPMorgan" includes Defendants JPMC, JPMCB, JPMS, and their subsidiaries and affiliates, including Bear Stearns & Co., that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

63.     During the Class Period, JPMorgan was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, in a Resolution Plan filed with the Federal Reserve, JPMorgan disclosed that its "[c]ustomers use derivatives to mitigate or modify . . . foreign exchange . . . risks" and that "the Firm actively manages the risks from its exposure to these derivatives by entering into other derivative transactions."[13]  JPMorgan confirmed that "foreign exchange forward contracts are used to manage the foreign exchange risk," and that the firm "enters into, as principal, certain exchange traded derivatives . . . such as futures and options." JPMorgan further disclosed that the notional amount of its FX contracts in 2013 was over $8.5 trillion dollars, including over $3.7 trillion in FX spot, futures, and forward transactions.

64.     JPMorgan also consistently appears on Euromoney's surveys of the top participants in the global FX market. In its Consent Orders on JPMorgan, the OCC observed that JPMorgan "engages in foreign exchange business (including G10 and other currencies, sales and trading in spot, forwards, options, or other derivatives)" and "was an active dealer in G10 spot foreign exchange market." And as noted above, JPMS is a registered futures merchant and a clearing member of the CME.

65.     As detailed below, government regulators have specifically targeted JPMorgan as part of their ongoing investigations into the manipulation of the FX market. The CFTC, FCA, and OCC have each already concluded that JPMorgan colluded with others banks to manipulate the FX market. JPMorgan has since suspended or terminated at least two FX employees, and banned the use of multi-bank chat rooms by its FX personnel.

---

[13] JPMorgan Chase & Co. Resolution Plan Public Filing (Jul. 1, 2014) (http://www.federalreserve.gov/bankinforeg/resolution-plans/jpmorgan-chase-1g-20140701.pdf).

66.     Upon information and belief, JP Morgan traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

67.     Morgan Stanley Defendant.  Defendant Morgan Stanley is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, New York.  Morgan Stanley is a financial holding company and global financial services firm. Defendant Morgan Stanley & Co., LLC ("MSC") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in New York, New York. MSC is a wholly owned subsidiary of Morgan Stanley. MSC is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. As used herein, the term "Morgan Stanley" includes Defendant Morgan Stanley, MSC, and their subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

68.     During the Class Period, Morgan Stanley was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, in a Resolution Plan filed with the FDIC, Morgan Stanley identified its FX operations as a "core business line," which "provides execution in spot, forward, and derivative currency markets to government and institutional clients."[14] Morgan Stanley also consistently appears on Euromoney's surveys of the top participants in the global FX market. And as noted above, MSC is a registered futures merchant and a clearing member of the CME.

69.     As detailed below, government regulators have specifically targeted Morgan Stanley as part of their ongoing investigations into the manipulation of the FX market. Morgan

---

[14] 2014 Morgan Stanley Resolution Plan (Jul. 1, 2014) (available at https://www.fdic.gov/regulations/reform/resplans/plans/morgan-165-7114.pdf).

Stanley has since overseen the departure of two high-ranking FX executives, and banned the use of multi-bank chat rooms by its FX personnel.

70.     Upon information and belief, Morgan Stanley traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

71.     RBS Defendants.  Defendant The Royal Bank of Scotland Group plc ("RBS Group") is a bank holding company organized and existing under the laws of the United Kingdom, with its principal place of business in Edinburgh, Scotland. RBS Group has substantial activities in the U.S., including in New York.  RBS Group is registered in the U.S. as a financial holding company and is subject to regulation and supervision by the Fed.

72.     Defendant Royal Bank of Scotland plc ("RBS plc") a corporation organized and existing under the laws of the United Kingdom with its principal place of business in Edinburgh, Scotland. RBS plc is a wholly owned subsidiary of RBS Group, and is the primary operating bank and subsidiary of RBS Group.  RBS plc has substantial operations in the U.S., including in New York.  RBS plc has branches in the U.S., including in New York, and has a registered office in New York.  RBS plc is also a member of the CME and ICE.

73.     Defendant RBS Securities, Inc. ("RBS Securities") is a corporation organized and existing under the laws of Delaware, with its principal places of business in Stamford, Connecticut. RBS Securities is a wholly owned subsidiary of RBS Group, and is RBS Group's primary US broker-dealer. RBS Securities is registered as a broker-dealer with the SEC, registered as a futures merchant with the CFTC, and is a clearing firm member of CME Clearing. RBS Securities engages in substantial trading activities in New York.  As used herein, the term "RBS" includes Defendants RBS Group, RBS plc, RBS Securities, and their

subsidiaries and affiliates that bought, sold, settled, or otherwise transacted in FX instruments during the Class Period.

74.     During the Class Period, RBS was a major participant in the FX market (including by transacting in spots, forwards, futures, and options), and a major dealer for FX spot and forward transactions. For instance, RBS consistently appears on Euromoney's surveys of the top participants in the global FX market. In its 2013 Annual Report, RBS stated that its "FX Options benefitted from opportunities in volatile FX and emerging markets," and that its spot FX business "minimised the impact" of weak currency volumes.[15]   In addition, RBS Securities' FINRA registration specifies that it "engages in swaps and foreign exchange brokerage," and as noted above, RBS Securities is a registered futures merchant and a clearing member of the CME.

75.     As detailed below, government regulators have specifically targeted RBS as part of their ongoing investigations into the manipulation of the FX market. The CFTC and FCA have already concluded that RBS colluded with others banks to manipulate the FX market. RBS has since placed at least six FX employees into a disciplinary process (three of whom have been suspended), and banned the use of multi-bank chat rooms by its FX personnel.

76.     Upon information and belief, RBS traded FX futures contracts at manipulated prices not reflecting fundamental supply and demand, to their direct benefit.

77.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged

---

[15] RBS Annual Report and Accounts 2013 (available at http://www.investors.rbs.com/~/media/Files/R/RBS-IR/2013-reports/annual-report-and-accounts-2013.pdf).

herein. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

## FACTUAL ALLEGATIONS

### I. BACKGROUND ON THE FOREIGN EXCHANGE MARKET AND FUTURES TRANSACTIONS

#### A. The Foreign Exchange Market Generally

78.     Foreign exchange involves the buying and selling of currency, or the exchanging of one type of currency for another. According to the latest survey of FX transaction turnover (the "2013 BIS Survey"), trading in foreign exchange markets averaged $5.3 trillion per day in April 2013.   This is up from $4.0 trillion in April 2010 and $3.3 trillion in April 2007.  The U.S. dollar remained the dominant vehicle currency; it was on one side of 87% of all FX trades in April 2013.  The euro was the second most traded currency, with a share of 33%.  FX trading is concentrated in the world's largest financial centers.  In April 2013, sales desks in the U.S., U.K., Singapore, and Japan intermediated 71% of foreign exchange trading, a trend that has increased in the past three years.

79.     The main types of trades in the FX market are spot, forwards, futures, and options transactions. A spot FX transaction involves the exchange of two currencies at a rate agreed upon on the date of the contract for value or delivery (cash settlement) within two business days. A forward contract, like a spot transaction, involves the exchange of two currencies at a rate agreed upon on the date of the contract for value or delivery (cash settlement) at some time in the future (more than two business days later). Trading of FX spots and forwards is largely done over-the-counter, meaning that there is no centralized exchange and that a customer must utilize a dealer, such as one of the Defendants.

24

80.     An FX futures contract is an agreement to buy or sell a foreign currency at a set price and date in the future. Futures differ from forwards largely in that they are traded on centralized exchanges—such as the Chicago Mercantile Exchange ("CME") and the ICE Futures U.S. Exchanges ("ICE")—and are cleared through a central clearinghouse, which acts as the buyer to every seller and the seller to every buyer, rather than being transacted directly with the counterparty. Because they are exchange-traded, futures are highly standardized, whereas forwards and other OTC transactions are customized to the needs of the transaction participants. Options on FX futures give the holder the right, but not the obligation, to buy or sell an underlying FX futures contract at a certain price.

**B.      FX Spot Transactions, and the Importance of Prices at 10 a.m. Central Time**

81.     For FX spots and forwards, dealers (also called market makers) exist to provide liquidity and to ensure there is always a counterparty for any transaction. To initiate an FX spot or forward transaction, a customer contacts a dealer indicating the currency and quantity she wishes to trade, and inquires as to the price. The dealer states prices at which it is willing to buy (the "bid") and sell (the "ask"). The customer then decides whether to buy, sell, or pass.  The dealer is compensated for its services by way of the gap between the quoted buy and sell prices, the "bid-ask spread." Dealers profit by providing this service to customers.

82.     Historically and to a large extent today, FX spot and forward transactions were carried out by telephoning a salesperson or voice broker at a dealer bank, who would receive the trade information, provide a bid and an ask price, and often accept a trade. Because FX salespeople have strong institutional relationships and keep track of clients' order histories, they are often able to predict client trading even before an order is placed. Throughout the order process salespeople are in regular contact with traders. They inform the traders of incoming

potential orders, they confirm bid and ask prices, and they ultimately convey placed orders to

the trading desk for processing. Thus, generally traders are aware of all potential and pending

trades that could be processed through their desks.

83.     Beginning in the late 1990s, the FX market has seen changes that tightened bid-

ask spreads and increased concentration as well as market power among the dealers, including

Defendants. In the late 1990s and continuing to the early 2000s, electronic trading platforms

emerged as a way to process foreign exchange transactions. In response to their customers'

demands for increased electronic trading, dealers—including many of the Defendants—

launched proprietary electronic trading platforms in the early 2000s, including UBS's FX

Trader, Barclays' BARX, Deutsche Bank's Autobahn, and Citi's Velocity.

84.     The effect of these trading platforms was to narrow bid-ask spreads by lowering

dealers' operating costs and reducing execution times. While in the 1980s the bid-ask spreads in

the over-the-counter market were roughly 20 times those in the inter-dealer market, they have

since compressed and are roughly equal. These bid-ask spreads have only reduced further since

the financial crisis.

85.     As the Financial Times reported, based on interviews with traders, given that

spreads are "the only source of client-driven income for banks in forex trades," this reduction in

spreads "may have encouraged traders to seek less transparent ways to cut their risks."[16]

86.     The introduction of electronic trading also led to an increase in market

concentration among FX dealers. Because dealers have been forced to invest heavily in

electronic trading technology while at the same time quoting tighter bid-ask spreads, smaller

---

[16] Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial
Times (Nov. 12, 2013).

dealers have largely exited the FX market. This increased concentration facilitated the collusion at issue in this complaint.

87.     In recent years, Defendants have taken a stranglehold over the FX market. According to a survey by Euromoney, an industry publication, Defendants occupy all twelve of the top spots by market share, and have an aggregate market share of over 80%.  Defendants' shares of the FX market in the previous two years are summarized below.

| Defendant | 2012 Market Share | 2013 Market Share |
|---|---|---|
| Deutsche Bank | 14.57% | 15.18% |
| Citigroup | 12.26% | 14.90% |
| Barclays | 10.95% | 10.24% |
| UBS | 10.48% | 10.11% |
| HSBC | 6.72% | 6.93% |
| JP Morgan | 6.60% | 6.07% |
| RBS | 5.86% | 5.62% |
| Credit Suisse | 4.68% | 3.70% |
| Morgan Stanley | 3.52% | 3.15% |
| Goldman Sachs | 3.12% | 2.75% |
| BNP Paribas | 2.63% | 2.52% |
| Bank of America | 2.41% | 3.08% |
| Defendants' Aggregate Market Share | 83.8% | 84.25% |

88.     As the market has become more concentrated, the community of FX traders at dealer banks has also shrunk.  These traders receive bonuses tied to their individual profits and the profits of the entire trading floor. Since the financial crisis, there have been staff reductions and the FX trading desks, even at the largest banks such as Defendants, are typically staffed with only eight to ten traders, many of whom have worked previously with their counterparts in other banks. Thus the market is dominated by a small group of individuals, often with strong social ties formed by working with each other at some point in the past. In fact, many of these traders live near each other, socialize together, belong to the same social clubs, and participate on the same professional committees.

89.     The Financial Times reports that interviews with more than a dozen foreign exchange veterans and investors suggest these changes in the structure of the Defendants' businesses and the small, close-knit exchange trader community have increased incentives and opportunism for collusion.[17] As one former Citi banker noted, "This is a market in which price fixing and collusion could actually work."[18]

90.     While an FX spot or forward contract may be entered into and executed at any time, investors often use what are called WM/Reuters rates as the price in a spot or forward transaction.

91.     A WM/Reuters rate, calculated largely based on actual trades by a joint venture between State Street Corp. (which owns World Markets Co. or "WM") and Reuters, provides a standardized rate that allows investors to price, settle, and value financial instruments such as spot and forwards transactions. A WM/Reuters rate is used by investors to avoid reconciliation differences that might result from making changes to a portfolio benchmarked against an index. In other words, investors often decide to tie a spot or forward transaction to a WM/Reuters rate in order to avoid poor or untimely execution of currency trades.

92.     Unlike some other financial benchmarks, WM/Reuters rates are merely median prices of all trades in a fixed period for currency pairs, determined on a half-hourly, hourly, or end-of-day basis.

93.     The WM/Reuters FX rates for twenty-one commonly traded "Trade Currencies" are calculated using actual trades and order rates from brokerage services such as the Reuters System during a 1 minute "fix" period starting 30 seconds before the beginning of each half-

---

[17] Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial Times (Nov. 12, 2013).

[18] Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial Times (Nov. 12, 2013).

hour. Rates for less-widely traded currencies are based on quotes during a two minute window. The benchmarks are calculated using the median of the actual trades made during the fix period. If there are insufficient transactions between a pair of currencies during the fix period, the benchmark is calculated from the median of traders' orders, which are offers to sell or bids to buy. The median methodology employed by WM/Reuters takes no account of the size of the notional behind each quote, weighting all quotes equally.

94.     The most widely used WM/Reuters rate is the WM/Reuters closing spot rate (defined above as the "WM/Reuters Closing Rate"), which is calculated around 4 p.m. London time (10 a.m. Central time). There is a WM/Reuters Closing Rate for every currency pair traded.

**C.      FX Futures and Options Transactions, and the Importance of Prices at 2 p.m. Central Time**

95.     Unlike the over the counter process by which FX spot and forward transactions are conducted, FX futures and options on futures are traded on exchanges like CME Globex and ICE Futures U.S. Exchange. FX Futures contracts are subject to standardized terms and conditions that govern the currency pairs, the quantity of currency to be exchanged, and the delivery time and place. For example, FX futures generally call for delivery of a specified quantity of a specified currency, or a cash settlement, during the months of March, June, September, and December. The quarterly Settlement Date is the third Wednesday in March, June, September, and December, with trading ending on the second business day before the third Wednesday of the contract month (usually a Monday). The only term in an FX futures contract that is subject to variation is price.

96.     Like futures, options on FX futures are also exchange-traded and are also highly standardized. Just as is the case with futures, price is the only competitive variable between options on futures contracts. There are two types of options: puts and calls. Put options give the

29

option holder the right, but not the obligation, to sell the underlying FX futures contract at a predetermined price (the strike price). Conversely, call options give the option holder the right, but not the obligation, to buy the underlying FX futures contract at the strike price. In either case, the option buyer pays a negotiated price, or premium, to the option seller. If the option contract is exercised, the buyer of the call option or seller of the put option establishes a position in a currency futures contract. Whether an option on an FX futures contract is exercised is purely a function of the price of the underlying commodity and the strike (or exercise) price set forth in the put or call option.

97.     Like other futures contracts, FX futures are secured by performance bonds that may be posted by both buyers and sellers. These performance bonds are also referred to as margin requirements, and are designed to anticipate, and secure against, the maximum anticipated one-day price movement. As set forth below, the day-to-day price movements (which determine how much margin must be posted) are calculated based on a snapshot of trading activity at a fixed time each day.

98.     Positions in futures contracts are marked-to-market on a daily basis, and the corresponding profits and losses posted to, or deducted from, the trader's account. For FX futures, mark-to-market amounts are banked in cash every day, meaning that gains and losses in currency futures are realized daily. The mark-to-market amount of a given futures contract is determined by taking the end-of-day settlement price of the futures contract and subtracting the previous day's end-of-day settlement price, and multiplying that figure (positive or negative) by the net position (positive for a net long position, negative for a net short position). The end of day settlement price is calculated based on the volume weighted average price of trades made

over the thirty-second interval ending at 2 p.m. Central time, *i.e.*, the CME Daily Settlement Rate fixing period.[19]

99.     The end of day settlement price is also used to determine which expiring options contracts are in the money and which are not. At the time of expiration (typically Fridays), CME uses the CME Daily Settlement Rate to force exercise of in the money options, and to force abandonment of out of the money options, for certain currencies in order to determine which FX futures contracts will be assigned to expiring options positions.

100.     The most common way for an FX futures transaction to settle is for the trader to enter into an offsetting transaction in the same currency pair, amount, and maturity, leaving him with a flat position, which is equivalent to having no position at all.[20] When a futures contract is closed out in this way, the trader's account is credited or debited according to the value of the original contract at the time that position was closed. The final settlement price is determined by CME based on the trading prices in the relevant contract during the 30 second period between 9:15:30 a.m. and 9:16:00 a.m. Central time on the settlement date.

## II.     DEFENDANTS HAVE ADMITTED TO COLLUDING TO MANIPULATE THE FX MARKET AT MULTIPLE TIMES OF DAY

### A.     Overview of the Tools Used by Defendants to Manipulate Prices

---

[19] The ICE FX futures exchange also uses prices around 2 p.m. Central time to perform similar calculations as done for futures on the CME exchange. Thus, all the allegations herein with respect to the CME Daily Settlement Rates are relevant to that exchange as well.

[20] This differs from forwards, where each forward contract is with a separate counterparty, and may have different terms, such as delivery dates. In such case, entering into a second, offsetting transaction leaves the party with two sets of contractual rights and obligations, one for each of the forward contract counterparties. In contrast, because futures are transacted through a central clearinghouse that acts as buyer to every seller and seller to every buyer, an offsetting transaction leaves the trader flat vis-à-vis his central clearing counterparty, effectively canceling the original trade and locking in the profit or loss of that trade at the time of the second, offsetting transaction.

101.    As discussed throughout this Complaint, there was a strong incentive to manipulate prices around key times of the FX trading day. But of course doing so is "a risky strategy that [Defendants] only attempted when [they] had a high degree of knowledge of other banks' positions."[21]

102.    To remove the uncertainties and risk associated with manipulation—i.e., that the market will move against a Defendant's position—and to reap greater profits in the foreign exchange market, Defendants regularly conspired with each other over the course of a decade to manipulate FX prices. These traders colluded on a daily basis, often throughout the day, about their customers' orders and their own intentions, and jointly agreed to work together to rig prices for currency pairs to their mutual advantage.

103.    This conspiracy took place at the highest levels of Defendants' foreign exchange divisions, including through the use of numerous multi-bank chatrooms. While the participants in these chatrooms varied over time, the conspiracies orchestrated through these chatrooms to manipulate FX prices continued for over a decade. Defendants formed and participated in these chatrooms with the specific intent to collude with each other to manipulate particular currency pairs.

104.    For instance, in one chatroom fittingly called "The Cartel," Richard Usher acted as leader and moderator—he operated it in his position at RBS until he left in 2010, and then revived it when he joined JP Morgan the same year. Numerous other traders employed by the Defendants have been part of "The Cartel."[22]

_____

[21] Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig CurrencyRates to Profit Off Clients*, Bloomberg (Jun. 12, 2013).

[22] While the membership of "The Cartel" changed somewhat over time, its principal participants were high ranking employees from the Defendants named here. This includes: (a) Richard Usher, who, before being placed on leave, was head of spot trading for G-10 currencies

105.    Defendants operated other private chatrooms in addition to "The Cartel." Some

of Defendants' traders were members of as many as fifty chatrooms. These chatrooms were

called, among other things, "The Mafia," "The Club," "The Bandits' Club," "The Dream

Team," "One Team, One Dream," and "The Sterling Lads."[23]

106.    The collusion among Defendants' employees was facilitated in part because

many of these traders worked together previously and formed social ties. Many of the colluding

traders live near each other, attend the same dinner parties, and are members of the same local

golf clubs. These traders also socialize in the chatrooms they use to manipulate the foreign

exchange rates, and transcripts that have been reviewed as part of the global investigation are

"peppered with allusions to drinks, drugs and women."[24] The shared community created by

social jokes and gossip facilitated the collusive agreements and practices in which these traders

engaged.

107.    The people responsible also swapped between Defendants, before reaching out to

former colleagues. For instance, Chris Ashton of Barclays was co-head of spot trading with Matt

at JP Morgan in London, and before that was a trader at RBS; (b) Rohan Ramchandani, who, before being suspended and then fired, was head of spot trading at Citi in London; (c) Matt Gardiner, who was suspended by Standard Chartered for his conduct as director of spot trading for EUR/USD at Barclays from 2007 to 2011 and as a trader at UBS from 2011 to 2013; and (d) Niall O'Riordan, who, until being suspended, was co-global head of G-10 and emerging market spot trading at UBS in Zurich.

[23] The members of these other chat rooms included: (a) Chris Ashton, head of spot trading at Barclays, and Jack Murray, Mark Clark, Russell Katz, and Jerry Urwin, also of Barclays; (b) Andrew Amantia and Anthony John of Citi; (c) Diego Moraiz, head of emerging markets trading, and Robert Wallden, Christopher Fahy, and Ezequiel Starobinsky, also of Deutsche Bank; (d) Serge Sarramenga, chief trader for G-10 currencies, and Edward Pinto at HSBC; (e) Paul Nash and Julian Munson at RBS; (f) Roger Boehler, global head of trading at UBS; and (g) Anthony John of Citi, who was involved in the "The Sterling Lads," a chatroom specializing in the fixing of the exchange rate between U.S. dollars and the pound sterling.

[24] Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial Times (Nov. 12, 2013).

Gardiner until Gardiner left Barclays for Citi, at which time Ashton and Gardiner began sharing their customers' confidential information and colluding to manipulate FX prices.

108.    Other overlaps allowed for even more cross-communications. For instance, Richard Usher, Rohan Ramchandani, and Niall O'Riordan are all members of the chief dealers' subgroup formed under the umbrella of the Bank of England's London Foreign Exchange Joint Standing Committee. In that role, Usher, Ramchandani and O'Riordan regularly discussed and agreed to manipulate FX prices, despite the fact that such discussions have no legitimate relationship to the Bank of England's activities. "Records of a meeting in April 2012 . . . show dealers discussed the rules they were subject to when trading close to the times when key market benchmarks, such as the WM/Reuters rates, are set."[25] According to two people with knowledge of the meeting, these traders "talked about how they shared information about orders to reduce the risk of losses in the minutes before benchmarks are calculated."[26]

109.    Sources interviewed by Bloomberg have admitted that Defendants' traders "would share details of orders with brokers and counterparts at banks through instant messages to align their strategies" and they "also would seek to glean information about impending trades to improve their chances of getting the desired move in the benchmark."[27] Traders employed by the Defendants interviewed by the Wall Street Journal and Financial Times have also confirmed that traders would communicate through "an electronic chat room populated by top traders at

---

[25] Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (Jun. 12, 2013).

[26] Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients,* Bloomberg (Jun. 12, 2013).

[27] Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (Jun. 12, 2013).

financial institutions"[28] and "chatroom discussions between rival traders . . . allowed them to share information about pricing and order books."[29] Multiple other reports confirm the chatrooms were being used to share confidential information with the intent to help manipulate prices,[30] *i.e.*, to "work[] as a pack" by sequencing trades to their collective advantage.[31]

110.    There are various ways, means, and terms to refer to the trading strategies deployed to profit off the collective power Defendants' wielded. For instance: (1) "front running"—which is an illegal practice—involves trading ahead of expected orders, essentially taking profits in advance when you know the market is about to move a certain way due to an upcoming surge of activity;[32] (2) "banging the close" involves making a high number of trades in a coordinated fashion around a measurement period;[33] (3) "painting the screen" is where orders with other dealers are used to create the illusion of trading activity in a given direction;

---

[28] Katie Martin, *Forex Probe Eyes Chat Room*, Wall St. J. (Oct. 11, 2013).

[29] Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial Times (Nov. 12, 2013).

[30] *See, e.g.*, Katie Martin & David Enrich, *Forex Probe Uncovers Collusion Attempts*, Wall St. J. (Dec. 19, 2013) ("common for a group of senior currency traders to discuss with their competitors types and volume of trades they planned to place"); Chiara Albanese, Katie Martin & David Enrich, Barclays, *Other Banks Expand Foreign-Exchange Review to Salespeople*, Wall St. J. (Nov. 19, 2013) (traders "inappropriately share market-sensitive information with rivals"); Gavin Finch, Liam Vaughan & Suzi Ring, *Ex-RBS Trader in U.K. Probe Said to Be JPMorgan's Usher*, Bloomberg (Oct. 14, 2013) (transcript involving RBS' Richard Usher, obtained by the U.K. Financial Conduct Authority, involved "messages to traders at other firms [that] included details of his trading positions").

[31] *E.g.*, Katie Martin & David Enrich, *Forex Probe Uncovers Collusion Attempts*, Wall St. J. (Dec. 19, 2013).

[32] *E.g.*, Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (Jun. 12, 2013).

[33] *Id.* ("To maximize profits, dealers would buy or sell client orders in installments during the 60-second window to exert the most pressure possible on the published rates."). In the context of WM/Reuters Closing Rates—which were based on the *median* rather than the *average* price during the measurement window—the impact of such tactics was increased by the banks' agreement to break up large transactions into smaller ones.

(4) "taking out the filth" and "clearing the decks" is where unfavorable transactions were netted off between Defendants, delayed, or otherwise handled in such a way as to not hit the market around a measurement period; and (5) "building," "giving you the ammo," and other terms refer to Defendants further magnifying the viability of these behaviors by transferring business to one participant, including so that the timing of execution (or non-execution) could be more centrally controlled.

111.    All of these techniques, and others, boil down to the fact that by jointly pressing through transactions that went one way for a time, while withholding transactions that went the other way at the same time, Defendants could together greatly distort prices during the exact, short time frame when key measurements of the market were being taken for purposes of setting benchmarks that they were all keenly interested in.

112.    In sum, Defendants succeeded in manipulating the measurements taken—i.e., the benchmarks themselves. To do so, they had to work together to intentionally distort prices in the actual markets for FX transactions through the sharing of confidential, competitively sensitive information, and through the coordination of what was supposed to be competitive bidding, buying, and selling processes.  Thus, Defendants' scheme involved the intentional manipulation of prices, harming investors who transacted during the periods when prices were distorted, as well as those whose accounts were impacted by margin or similar calls based on artificial benchmark prices.

**B.**    **Government Investigations Have Confirmed that Defendants Manipulated the FX Market at Multiple Times of Day**

113.    Beginning in the fall of 2013, media reports surfaced that government regulators and enforcement authorities were investigating Defendants' manipulation of the FX market. These investigations quickly grew in scope to include authorities from across the globe—

including in the U.S., U.K., European Union, Switzerland, Germany, Hong Kong, Singapore,

Australia, and New Zealand.

114.    As detailed below, all of these Defendants have been targeted by government

regulators for their role in the manipulation of the FX market. Some of those investigations have

already resulted in settlements and fines totaling billions of dollars, as well as the release of

damning reports detailing exactly how these Defendants actively colluded to manipulate the FX

market. Many other government investigations are still ongoing, including criminal

investigations by the U.S. Department of Justice.

            **1.     The CFTC's Orders on Citi, HSBC, JPMorgan, RBS, UBS, and Barclays**

115.    The Commodity Futures Trading Commission ("CFTC") is an independent U.S.

government agency that regulates futures, options, and swaps.  Around 2013, the CFTC

launched an investigation into whether certain banks had manipulated the FX market in

violation of the Commodity Exchange Act ("CEA"). On November 11, 2014, the CFTC entered

into five separate Orders against Defendants Citi, HSBC, JPMorgan, RBS, and UBS.34   The

CFTC concluded that these Defendants violated the CEA by conspiring with other banks to

manipulate FX benchmark rates, including the WM/Reuters Closing Rate. The CTFC levied

substantial civil penalties on each of these Defendants: $310 million each on Citi and JPMorgan,

$290 million each on RBS and UBS, and $275 million on HSBC.

116.    The CFTC found that each of these Defendants "by and through certain of [their]

FX traders, at times sought to benefit its own trading positions or those of certain FX traders at

other banks by attempting to manipulate and aiding and abetting certain traders at other banks in

---

[34] *CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates*, Release PR 7056-14 (Nov. 12, 2014) (available, with links to Consent Orders, at http://www.cftc.gov/PressRoom/PressReleases/ pr7056-14).

their attempts to manipulate certain foreign exchange benchmark rates."35 Specifically,

Defendants' FX traders "coordinated their trading with certain FX traders at other banks to

attempt to manipulate certain FX benchmark rates, including the 4 p.m. WM/Reuters Closing

Rate fixing period, to their benefit. These FX traders . . . and the other banks used private

electronic chat rooms to communicate and plan their attempts to manipulate the FX benchmark

rates for certain currency pairs." In those electronic chat rooms, these Defendants also

"disclosed confidential customer order information and trading positions, altered trading

positions to accommodate the interests of the collective group, and agreed on trading strategies

as part of an effort by the group to attempt to manipulate certain FX benchmark rates."

117.   The CFTC found that this misconduct occurred because Defendants "failed to

adequately assess the risks associated with [their] FX traders participating in the fixing of

certain FX benchmark rates," and "lacked adequate internal controls in order to prevent [their]

FX traders from engaging in improper communications with certain FX traders at other banks."

The CFTC observed that Citi, HSBC, and JPMorgan have each since banned the use of multi-

bank chat rooms by FX personnel.

118.   The CFTC concluded that Citi, HSBC, JPMorgan, RBS, and UBS each violated

the CEA in several ways: (i) by attempting to manipulate the price of a commodity in violation

of CEA Sections 6(c), 6(d) and 9(a)(2) (7 U.S.C. §§ 9, 13b, and 13(a)(2) (2012)) and Regulation

180.2, 17 C.F.R. § 180.2 (2014); (ii) by aiding and abetting the attempts of traders at other

banks to manipulate FX benchmark rates, in violation of CEA Section 13(a) (7 U.S.C. § 13c(a)

(2012)); and (iii) as a principal for the acts, omissions, and failures of any traders who acted as

---

35 *See, e.g.*, *In the Matter of Citibank, N.A.*, Order Instituting Proceedings Pursuant
CFTC Dkt. No. 15-03 (Nov. 11, 2014) at 2.

their employees and/or agents, in violation of CEA Section 2(a)(1)(B) (7 U.S.C. § 2(a)(1)(B) (2012)), and Regulation 1.2 (17 C.F.R. § 1.2 (2014)).

119.    The CFTC ordered that Citi, HSBC, JPMorgan, RBS, and UBS undertake remedial measures to improve their internal controls and procedures, including monitoring systems to detect manipulation of FX benchmark rates, periodic audits of their FX operations, supervision of FX trading desks, and ongoing training and reviews of FX traders.

120.    The CFTC's findings are supported by many specific examples of misconduct by each of these Defendants, generally in the form of transcripts of chat room conversations that the CFTC released with its Orders.  For instance, in one electronic chat, a Citi FX trader discussed with traders from other banks whether to invite a new trader into a "Cartel" chat room:

| Bank Z Trader: | 7:49:55 | are we ok with keeping this as is |
| | 7:50:27 | ie the info lvls & risk sharing? |
| Citibank Trader: | 7:50:27 | well... |
| Bank Z Trader: | 7:50:30 | that is the qu[estion] |
| Citibank Trader: | 7:50:32 | you know him best obv... |
| | 7:50:39 | if you think we need to adjust it |
| | 7:50:43 | then he shouldn't be[] in chat |
| Bank Y Trader: | 7:50:54 | yeah that is key |
| | 7:51:00 | simple question [Bank Z trader] |
| | 7:51:08 | I trust you implicitly [Bank Z trader] |
| | 7:51:13 | and your judgement |
| | 7:51:16 | you know him |
| | 7:51:21 | will he tell rest of desk stuff |
| | 7:51:26 | or god forbin his nyk... |
| Citibank Trader: | 7:51:46 | yes |
| | 7:51:51 | that's really imp[ortant] q[uestion] |
| | 7:52:01 | dont want other numpty's in mkt to know |
| | 7:52:17 | but not only that |
| | 7:52:21 | is he gonna protect us |
| | 7:52:33 | like we protect each other against our own branches |
| | 7:52:46 | ie if you guys are rhs5.. and my nyk is lhs..ill say my nyk lhs in few |
| Bank Z Trader: | 7:53:52 | what concerns me is that i know he'll never tell us when at risk... |

121.    After discussion of whether the new trader would "add huge value to this cartel,"

the traders decided to invite the trader into the chat room for a "1 month trial," with the Citibank

trader warning him, presumably facetiously, "mess this up and sleep with one eye open at

night."

122.    In another example, RBS had a client order to sell the GBP/USD currency pair at

the 4 p.m. WM/Reuters Closing Rate fixing period. In that situation, RBS would benefit from

driving the WM/Reuters Closing Rate downward.  An RBS trader shared this trade information

with other traders in an electronic chat room, and learned that they also had sell orders for that

40

currency pair. The traders then coordinated their positions immediately before the fixing, and

discussed the favorable results immediately afterwards:

| 15:45:357 | RBS Trader: | im getting abt 80 quid now…fixing |
| 15:45:54 | Bank U Trader: | my ny 100 quid… |
| 15:51:19 | RBS Trader: | getting more than u now [Bank U Trader] betty |
| 15:51:26 | Bank U Trader: | ok thx |
| 15:52:23 | Bank W Trader: | nice job gents |
| 15:54:16 | Bank U Trader: | [RBS Trader], just matched with [Bank 1] and [Bank 2] for 100, still lhs in about 140 |
| 15:54:26 | RBS Trader: | cool …. |
| 16:00:58 | Bank Z Trader: | i don my hat …. |
| 16:01:08 | Bank W Trader: | what a job |
| 16:01:23 | Bank Z Trader: | welld one lads |
| 16:01:28 | Bank W Trader: | bravo |
| 16:07:03 | RBS Trader: | 1.6218..nice |
| 16:07:33 | Bank U Trader: | worked ok that one… |

123.    The CFTC released many other, similar examples of misconduct by traders at

Citi, HSBC, JPMorgan, RBS, and UBS.

124.    The CFTC's investigations are still ongoing, including against Barclays, which

reportedly pulled out of settlement discussions with the CFTC and other regulators due to

concerns about civil liabilities and the potential of having its New York banking license

revoked.[36]

125.    On May 20, 2105, the CFTC issued an order filing and settling charges against

Barclays Bank PLC for attempting manipulation, false reporting, and aiding and abetting other

banks' attempts to manipulate global foreign exchange (FX) benchmark rates to benefit the

---

[36] Kirstin Ridley, Joshua Franklin, and Aruna Viswanatha, Reuters, *Regulators fine global banks $4.3 billion in currency investigation* (Nov. 12, 2014) (available at http://www.reuters.com/article/2014/11/12/us-banks-forex-settlement-cftc-idUSKCN0IW0E520141112); Stephen Morris and Richard Partington, Bloomberg, *Barclays Falls After FX Settlement Delay Reduces Discount* (Nov. 11, 2014) (available at http://www.bloomberg.com/news/articles/2014-11-12/barclays-says-not-ready-to-settle-in-global-fx-probe).

positions of certain traders.  The Order required Barclays to pay $400 million in civil monetary penalties.

126.    According to the Order, "one of the primary benchmarks that Barclays FX traders attempted to manipulate was the World Markets/Reuters Closing Spot Rates (WM/R Rates). The WM/R Rates, the most widely referenced FX benchmark rates in the United States and globally, are used to establish the relative values of different currencies, which reflect the rates at which one currency is exchanged for another currency. Another FX benchmark rate that a Barclays FX trader attempted to manipulate is the Russian Ruble/U.S. Dollar Chicago Mercantile Exchange (CME)/EMTA, Inc. benchmark rate (CME/EMTA Rate) that is based on indicative bids and offers submitted by banks to the CME, who calculates and issues the CME/EMTA Rate as well as publishes the submitted bids and offers of each participant."

127.    The Order "finds that certain FX traders at Barclays and other banks coordinated their trading or indicative rate submissions to attempt to manipulate certain FX benchmark rates, including the WM/R 4 p.m. London fix and the CME/EMTA Rate, to their benefit. These FX traders at Barclays and the other banks used private chat rooms to communicate and plan their attempts to manipulate the FX benchmark rates. In these chat rooms, FX traders at the Banks disclosed confidential customer order information and trading positions, altered trading positions or CME/EMTA submissions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates. These chat rooms were sometimes exclusive and invitation only."

     *(a)*     *The DOJ's investigation*

128.    Around the fall of 2013, the U.S. Department of Justice ("DOJ") Criminal and Antitrust Divisions launched a broad civil and criminal investigation into Defendants'

manipulation of the FX market. In an interview, U.S. Attorney General Eric Holder stated that "[w]e've recognized that this is an extremely consequential investigation," and that "[t]he manipulation we've seen so far may just be the tip of the iceberg."[37] The Attorney General added that the DOJ was "taking a leading role" in this "truly global investigation."

129.    The DOJ has specifically targeted these Defendants, including but not limited to Barclays, Citi, HSBC, JPMorgan, RBS, and UBS.  Many of those banks were required to produce documents and information relating to their FX operations pursuant to deferred prosecution and non-prosecution agreements they entered with the DOJ in connection with its investigation into manipulation of the LIBOR benchmark interest rate. According to Mythili Raman, the acting head of the DOJ's criminal division, "[t]he cooperation we have been able to secure as part of our agreements in the Libor investigation has been very helpful to us in terms of holding banks' feet to the fire."[38] In addition, UBS reportedly approached the DOJ with incriminating documents relating to the FX probe in hope of gaining immunity or leniency from the DOJ's antitrust prosecutions as the "first firm to cooperate."[39]

130.    The DOJ has continued to press the Defendants for information on their FX operations. Around November 13, 2014, the DOJ reportedly gave banks one month to provide a

---

[37] Ben Protess, Landon Thomas Jr. and Chad Bray, NY Times, *U.S. Investigates Currency Trades by Major Banks* (Nov. 14, 2013) (available at http://dealbook.nytimes.com/2013/11/14/u-s-investigates-currency-trades-by-major-banks/).

[38] David McLaughlin and Tom Schoenberg, Bloomberg, *Banks Aid U.S. Forex Probe, Fulfilling Libor Accords* (Jan. 22, 2014) (available at http://www.bloomberg.com/news/articles/2014-01-23/banks-aid-u-s-forex-probe-fullfilling-libor-accords).

[39] Jamie McGeever, Reuters, *UBS seeks first-mover immunity in U.S. currency probe* (Feb. 7, 2014) (available at http://www.reuters.com/article/2014/02/07/us-ubs-forex-idUSBREA161UN20140207).

full accounting of any misconduct.[40] Attorney General Eric Holder stated at that time that he

expected the DOJ to conclude its investigation "relatively soon," and would move toward civil

and criminal resolutions.

131.     Since that time, the DOJ's investigation has uncovered new avenues of potential

manipulation, including reports that HSBC leaked confidential FX-related information to a

major hedge fund.[41] By February 2015, the DOJ had reportedly grown more certain that they

had evidence to support criminal charges of collusive conduct by Barclays, Citi, JPMorgan, and

RBS in particular, and was insisting that those banks enter guilty pleas in order to settle the

cases against them.[42] In March 2015, the DOJ was reported to be seeking $1 billion each from

the banks that it was investigating.[43] The DOJ has also confirmed that it is preparing cases

against individual current and former employees of the banks.

132.     On March 23, 2015, the Court in the class action brought by purchasers of FX

spot and forward contracts entered a six-month stay of discovery in that case, in order to

---

[40] David McLaughlin, Bloomberg, *U.S. Said to Give Banks December Deadline in FX Probe* (Nov. 13, 2014) (available at http://www.bloomberg.com/news/articles/2014-11-13/u-s- said-to-give-banks-december-deadline-in-fx-probe).

[41] Katie Martin, Chiara Albanese and David Enrich, Wall St. J., *Justice Department Investigating Possible HSBC Leak to Hedge Fund* (Nov. 25, 2014) (available at http://www.wsj.com/articles/justice-department-investigating-possible-hsbc-leak-to-hedge-fund-1416953090).

[42] Davlin Barrett and Christopher Matthews, Wall St. J., *U.S. Seeks Guilty Pleas From 4 Banks in Currency Antitrust Probe* (Feb. 10, 2015) (available at http://www.wsj.com/articles/u-s-seeks-guilty-pleas-from-4-banks-in-currency-antitrust-probe-1423616204); Ben Protess and Jessica Silver-Greenberg, NY Times (Feb. 9, 2015) (available at http://dealbook.nytimes.com/2015/02/09/u-s-is-seeking-felony-pleas-by-big-banks-in-foreign-currency-inquiry/?_r=0).

[43] Keri Geiger and Greg Farrell, Bloomberg, *U.S. Is Seeking Billions From Global Banks in Currency Manipulation Settlement* (Mar. 13, 2015) (available at http://www.bloomberg.com/news/articles/2015-03-13/u-s-said-to-start-at-1b-a-bank-to-settle-currency-probe).

accommodate the DOJ's continuing investigations. Case No. 13-cv-7789 (LGS), Dkt. No. 274

(S.D.N.Y. Mar. 23, 2015).

    (b)    *The DOJ's Investigation Results in Felony Pleas With Four Defendants*

133.    On May 20, 2015, the DOJ announced that Citicorp, JP Morgan Chase & Co.,

Barclays, PLC, and the Royal Bank of Scotland plc agreed to plead guilty to conspiring to

manipulate the price of U.S. dollars and euros exchanged in the foreign currency spot market.

134.    According to the felony plea agreements, between December 2007 and January

2013, euro-dollar traders at Citicorp, JPMorgan, Barclays and RBS – "self-described members

of the 'The Cartel' – used an exclusive electronic chat room and coded language to manipulate

benchmark exchange rates."

135.    According to the felony plea agreements, "[t]hose rates are set through, among

other ways, two major daily 'fixes,' the 1:15 European Central Bank fix and the 4:00 p.m.

World Markets/Reuters Fix."

136.    According to the felony plea agreements, "'[t]he Cartel' traders coordinated their

trading of U.S. dollars and euros to manipulate the benchmark rates set at the 1:15 p.m. and 4:00

p.m. fixes in an effort to increase their profits."

137.    As detailed in the plea agreements, "these traders also used their exclusive

electronic chats to manipulate the euro-dollar exchange rate in other ways.  Members of 'The

Cartel' manipulated the euro-dollar exchange rate by agreeing to withhold bids or offers for

euros or dollars to avoid moving the exchange rate in a direction adverse to open positions held

by co-conspirators.  By agreeing not to buy or sell at certain times, the traders protected each

other's open trading positions by withholding supply of or demand for currency and suppressing

competition in the FX market."

138.     Citicorp, Barclays, JP Morgan, and RBS each pled guilty to one felony count charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere.

139.     Citicorp, which according to the plea agreement was involved from as early as December 2007 through at least January 2013, agreed to a fine of $925 million.

140.     Barclays, which according to the plea agreement was involved from as early as December 2007 until July 2011 and then from December 2011 to August 2012, agreed to pay a fine of $650 million;

141.     JP Morgan, which was involved from at least as early as July 2010 until January 2013 as detailed in its plea agreement, agreed to pay a fine of $550 million;

142.     RBS, which – according to its plea deal, was involved from as early as December 2007 through at least April 2010, agreed to a fine of $395 million.

### 2.     The OCC Orders on BofA, Citi, and JPMorgan

143.     The Office of the Comptroller of the Currency ("OCC") is an independent bureau of the U.S. Department of the Treasury which regulates and supervises all national banks and federal savings associations.

144.     The OCC conducted an examination of several national banks for their involvement in the manipulation of the FX market. On November 11, 2014, the OCC entered Consent Orders against BofA, Citi, and JPMorgan.[44] The OCC "identified certain deficiencies and unsafe or unsound practices related to" each of those Defendants' FX operations, and levied substantial fines: $250 million on BofA, and $350 million each on Citi and JPMorgan.

---

[44] *OCC Fines Three Banks $950 Million for FX Trading Improprieties*, NR 2014-157 (Nov. 12, 2014) (available, with links to Consent Orders, at http://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157.html).

145.    Like the other regulators, the OCC found that these Defendants used electronic

messaging platforms to manipulate FX prices and benchmark rates, including by means of:

(a)  Discussions of coordinating trading strategies among the Bank's traders and
traders at others banks to manipulate the WM/Reuters spot FX benchmark rates or
ECB spot FX reference rates to the benefit of the trader or the Bank or both and to
the potential detriment to some of the Bank's customers;

(b)  Discussions of trading, either alone or collusively, to trigger customers' limit
orders, such as stop loss or take profit orders, or customers' barrier options for
the trader or Bank's benefit and to the potential detriment of such customers;

(c)  Discussions of trading in advance of pending customers' orders for the
trader or Bank's benefit and to the potential detriment of such customers; and

(d)  Discussions which resulted in disclosure of confidential Bank information,
including the disclosure of information regarding customer order flows and
proprietary Bank information, such as FX rate spreads.

146.    The OCC found that BofA, Citi, and JPMorgan "had deficiencies in [their]

internal controls and had engaged in unsafe or unsound banking practices with respect to the

oversight and governance of [their] FX Trading," which allowed the aforementioned practices to

occur. The OCC ordered that BofA, Citi, and JPMorgan implement extensive remedial

procedures, including effective controls, oversight, monitoring, surveillance, compliance testing,

and regular audits of its FX trading activities.

### 3.    The FCA's Notices on Citi, HSBC, JPMorgan, RBS, and UBS

147.    The Financial Conduct Authority ("FCA") is an independent financial regulatory

body in the U.K, whose stated objectives are to "protect consumers," "protect financial

markets," and "promote competition."[45]

148.    The FCA launched its own investigation into the banks' manipulation of the FX

market. On November 11, 2014, the FCA entered Final Notices on Defendants Citi, HSBC,

---

[45] FCA, What we do (available at http://www.fca.org.uk/about/what).

JPMorgan, RBS, and UBS.46  The FCA found that each of these Defendants violated the FCA's

Principles of Business by failing to "control its trading operations in the G10 spot FX market,

with the result that traders in this part of its business were able to behave in a manner that put

[its own] interests ahead of the interests of its clients, other market participants and the wider

UK financial system." The FCA levied substantial civil penalties on each of these Defendants:

$358 million on Citi, $343 million on HSBC, $352 million on JPMorgan, $344 million on RBS,

and $371 million on UBS.

149.    The FCA found that Citi, HSBC, JPMorgan, RBS, and UBS each "allowed the

following behaviours to occur . . . (1) Attempts to manipulate the WMR and the ECB fix rates in

collusion with traders at other firms, for [its] own benefit and to the potential detriment of

certain of its clients and/or other market participants; (2) Attempts to trigger clients' stop loss

orders for [its] own benefit and to the potential detriment of those clients and/or other market

participants; and (3) Inappropriate sharing of confidential information with traders at other

firms, including specific client identities and, as part of (1) and (2) above, information about

clients' orders." The FCA detailed the various techniques that each of these Defendants used to

accomplish this manipulation, including by "taking out the filth" or "clearing the decks,"

(netting off orders with third parties who had positions in the opposition direction as

Defendants'), "giving you the ammo," (consolidating orders with a single trader to more

effectively carry out a manipulation strategy), "building" (transacting with third parties to

increase the volume of orders in the desired direction), and "overbuying" or "overselling"

---

46 *FCA fines five banks 1.1 billion for FX failings and announces industry-wide remediation program* (Nov. 12, 2014) (available, with links to Final Notices, at http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings).

(increasing the volume traded at the fix in the desired direction in excess of the amount necessary to manage risk).

150.    The FCA held that these Defendants' misconduct was "extremely serious" and "had a very serious and adverse effect on markets . . . due to the fundamental importance of spot FX benchmarks and intra-day rates for G10 currencies, their widespread use by market participants and the consequent negative impact on confidence in the spot FX market and the wider UK financial system arising from misconduct in relation to them."

151.    The FCA also provided specific examples of misconduct by each of these Defendants. For instance, on one day during the Class Period, JPMorgan had net buy orders of the EUR/USD currency pair at the WM/Reuters Closing Rate fixing period, which meant that it would benefit if it could move the rate upwards.  In the 20 minutes preceding the fixing, a JPMorgan trader disclosed its net orders to another trader, and agreed to "join forces" and "double team em" by coordinating with the other trader to move the fix rate upwards.  Prior to the fix window, JPMorgan "built" the volume of EUR that it needed to buy in a series of transactions with market participants. Then during the fixing window, JPMorgan and the collaborating trader entered a series of large buy orders totaling EUR 259 million—which accounted for 41% of the total volume of EUR/USD bought during the fix window.  The strategy was a success, generating a profit of approximately $33,000.  Afterward, the collaborating trader stated "sml rumour we havent lost it" to which the JPMorgan trader responded "we…do…dollarrr." The collaborating trader's bravado continued into the next day, stating to yet another trader "we were EPIC at the [WMR] fix yest" and "i dragged [JPMorgan] in, we covered all the bases b/w us."

152.    The FCA provided a similar example of fix manipulation by HSBC, which held a net sell position and would benefit from moving the WM/Reuters Closing Rate lower.  An HSBC trader accomplished this by coordinating with traders at three other firms to "team whack it." These traders used a variety of techniques, including "building," "clearing the decks," and coordinating large sell orders in and around the fixing window to suppress the closing rate. The result was a profit of approximately $162,000.  The traders congratulated one another by saying "nice work gents…I don my hat", "Hooray nice team work", "bravo…cudnt been better" and "have that my son…v nice mate" and "dont mess with our ccy [currency]." One of the traders commented "there you go … go early, move it, hold it, push it." The HSBC trader stated "loved that mate… worked lovely… pity we couldn't get it below the 0012" and "we need a few more of those for me to get back on track this month." The FCA released many other, similar examples of misconduct by traders at Citi, HSBC, JPMorgan, RBS, and UBS.

153.    The FCA's investigations are still ongoing, including against Barclays.  The FCA has also made inquiries of Morgan Stanley as part of its FX investigation.[47]

### 4.    The FINMA Report on UBS

154.    The Financial Market Supervisory Authority ("FINMA") is an independent Swiss government institution responsible for financial regulation, including the supervision of banks.

155.    In September 2013, UBS informed FINMA and other authorities that an internal UBS investigation "had uncovered possible signs of manipulation, collusion, and other market

---

[47] Helia Ebrahimi, CNBC, *Morgan Stanley contacted over forex probe* (Nov. 6, 2013) (available at http://www.cnbc.com/id/101175614#.); Jesse Hamilton, Dakin Campbell, Suzi Ring, and Gavin Finch, Bloomberg, *Banks Said to Get Enforcement Letters in FX-Rigging Probe* (Aug. 14, 2014) (available at http://www.bloomberg.com/news/articles/2014-08-13/banks-said-to-get-enforcement-letters-in-fx-rigging-probe).

abusive conduct" in FX trading. FINMA initiated enforcement proceedings against UBS, and

released a Report of its findings on November 12, 2014.48 FINMA concluded that UBS

"repeatedly and over a long period of time at least attempted to manipulate foreign exchange

benchmarks and acted against the interests of its own clients." FINMA held that by doing so,

UBS "seriously violated the requirements for proper business conduct and those for adequate

organization stipulated in supervisory law," and imposed a fine of 134 million francs ($141

million USD).

156.   Specifically, FINMA found that:

[UBS's FX traders] repeatedly and over longer periods of time at least attempted
(or deliberately accepted the possibility of) manipulation of foreign exchange
benchmarks by aggressively executing trades of large volume so as to generate
profits either for themselves or third parties.  This was achieved due to exact
timing of the execution of foreign exchange trades around the fixing window.
The WMR 4pm fix, for instance, could be influenced by concentrating the bank's own
pre-positioning trades around the time slots just before or after the fix time slot.
Depending on their risk appetite, traders would trade closer or further away from
the fix time slot.

157.   In addition:

[UBS] repeatedly and unacceptably often acted against their clients' and
counterparties' interests, particularly by:  (i) triggering ("jamming") of stop loss
orders where client stop orders were actively triggered to the bank's advantage, (ii)
front running client orders by executing aligned orders in advance, (iii) partial fills
where at least a part of the client's profitable transaction in foreign exchange was
credited to the bank, (iv) disclosure of confidential client information, (v)
condoning actions in bad faith by third parties, (vi) occasional deceptive acts with
regard to sales mark-ups, as well as excessive mark-ups associated with one of the
bank's products.

158.   FINMA ordered that UBS take extensive corrective measures, including by

strengthening its compliance function, limiting and monitoring certain communication media,

---

[48] *FINMA sanctions foreign exchange manipulation at UBS* (Nov. 12, 2014) (available, with
link to report, at http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx).

prohibiting certain employee transactions, mandating regular internal audits, and strengthening

the whistle-blowing process.

159.    FINMA included with its Report extracts from hundreds of electronic chat

transcripts, in which UBS traders actively attempted to manipulate FX prices and benchmarks,

and/or bragged about their successes.  For example:

> After a fix before which trading positions had been shared:  UBS trader:  "nice work gents."  Trader at another bank:  "not seen cable move like that in a while."
>
> After a fix before which trading positions had been shared: UBS trader: "yeah very nice [...] that how every day should end."
>
> UBS trader:   "jamming some stops in eurusd here at 0515."
>
> UBS trader:   "ready?"  Trader at another bank:  "when u r."  UBS Trader A:  "DONE."  UBS Trader B:  "got that […] stop out eventually?"  UBS Trader A:  "ya."  UBS Trader B:  "nice one […] excellent."
>
> UBS trader: "I was front running EVERY single offer in usdjpy and eurjpy."
>
> UBS trader:  "the day of intervention, i was front running EVERY SINGLE ODA and I mean EVERY haha."
>
> UBS trader:  "I made 150k Front Running the try styff."
>
> UBS trader:  "I was using my management book to front-run an order."
>
> UBS trader to trader at another bank:  "stay short, flow here, I tell you when we are done, keep it super hush bro."
>
> UBS Trader A to UBS Trader B (internal chat): "these are wicked dogs at the pm desk. Sick what they're doing, haha." UBS Trader B: "1.1 mio up on the day, beautiful." UBS Trader A:  "hohohoho."
>
> UBS trader: "call me a legend! Front run legend."

160.    FINMA's investigation into UBS's misconduct is ongoing, as FINMA has

initiated proceedings against eleven of UBS's former and current employees.

### 5.    Other ongoing investigations

161.     Other authorities across the globe are also actively investigating Defendants'
colluded to manipulate the FX market.

162.     **The U.S. Federal Reserve** announced on January 14, 2014 that it was conducting
an investigation and joining other regulators in ascertaining the truth surrounding the
manipulation of the FX market.

163.     **The U.S. Securities and Exchange Commission ("SEC")** was reported in March
2014 to have launched an investigation into whether the banks distorted prices for FX options
and exchange-traded funds.[49]

164.     **The New York Department of Financial Services ("DFS")** regulates banks
licensed to do business in New York.  The DFS is reportedly investigating about a dozen
banks for their role in manipulating the FX market.[50] In addition to misconduct by
individual traders in electronic chat rooms, the DFS is investigating whether the banks
used algorithms on their electronic trading platforms to manipulate FX prices. The DFS
initially focused its investigation on Defendants Barclays and Deutsche Bank, and has
installed specialist advisory firms as monitors at both of those banks.[51]

---

[49] Keri Geiger and Silla Brush, Bloomberg, *SEC Said to Probe Whether Forex Rigging
Distorted Options* (Mar. 10, 2014) (available at http://www.bloomberg.com/news/articles/2014-
03-10/sec-said-to-probe-whether-forex-rigging-distorted-options).
[50] Greg Farrell, Bloomberg, *Lawsky Said to Probe Barclays, Deutsche Bank FX Algorithm*
(Dec. 10, 2014) (available at http://www.bloomberg.com/news/articles/2014-12-10/ny-regulator-
said-to-probe-deutsche-bank-barclays-fx-algorithms).

[51] Karen Freifeld, Reuters, *NY monitor in Deutsche to probe possible forex rigging* (Feb. 9,
2015) (available at http://www.reuters.com/article/2015/02/09/deutsche-monitor-forex-
idUSL1N0VJ1Q220150209).

165.    In December 2014, the DFS expanded its probe by also serving subpoenas on Defendants BNP Paribas, Credit Suisse, and Goldman Sachs.[52] Those Defendants began to produce responsive information in late January, including transcripts of traders discussing the manipulation of algorithms. The DFS's investigation is ongoing, and it is reportedly weighing various fines and punishments against these Defendants, including by imposing restrictions on certain Barclays New York business lines, and the required termination of certain Barclays employees.[53]

166.    **The Financial Stability Board ("FSB")** is an international body that monitors and makes recommendations about the global financial system. On February 14, 2014, the FSB announced that it would undertake "a review of FX benchmarks and will analyse market practices in relation to their use and functioning of the FX market as relevant."[54] The investigation was launched in response to "concerns [that] have been raised about the integrity of FX rate benchmarks," and the "[c]onclusions and recommendations will be transmitted by the FSB to the Brisbane Summit."

167.    **The U.K. Serious Fraud Office ("SFO")** is an independent U.K. government department responsible for investigating and prosecuting serious and complex fraud and corruption. On July 21, 2014, the SFO announced that it "has today

---

[52] Karen Freifeld, Reuters, *NY financial regulator subpoenas banks in forex probe* (Feb. 10, 2015) (available at http://www.reuters.com/article/2015/02/10/usa-banks-probes-idUSL4N0VK61V20150210).

[53] Devin Barrett and Christopher Matthews, *Dow Jones Business News, U.S. Seeks Guilty Pleas from 4 Banks in Currency Antitrust Probe* (Feb. 10, 2015) (available at http://www.nasdaq.com/article/us-seeks-guilty-pleas-from-4-banks-in-currency-antitrust-probe-20150210-01499).

[54] *FSB to review foreign exchange benchmarks* (Feb. 14, 2014) (available at http://www.financialstabilityboard.org/2014/02/pr_140213/).

opened a criminal investigation into allegations of fraudulent conduct in the foreign exchange market."[55]

168.    George Osborne, the U.K. Chancellor of the Treasury has pledged his full support for the SFO's investigation, stating that "I understand that the SFO is in the early stages of a major investigation into forex trading. Given the importance of this work, the Treasury will provide the required funding for this investigation."[56]

169.    On December 19, 2014, the SFO made its first arrest in connection with its FX investigation. The suspect has since been identified as Paul Nash, a former FX trader for Defendant RBS.[57] Nash, who is the first individual to have been arrested in connection with the global FX investigations, was suspended by RBS in 2013.

170.    *The German Federal Financial Supervisory Authority ("BaFin")* is an independent German authority responsible for supervising banks and financial service providers. Around January 2014, BaFin began an investigation into potential FX manipulation by traders at Defendant Deutsche Bank. BaFin reportedly put the case at the top of its priority list, and moved it into a "special investigation" category.[58]

---

[55] SFO, *Forex investigation* (Jul. 21, 2014) (available at https://www.sfo.gov.uk/press-room/latest-press-releases/press-releases-2014/forex-investigation.aspx).

[56] Andrew Trotman and James Titcomb, The Telegraph, *George Osborne:  I will give SFO blank cheque to probe forex manipulation* (Nov. 14, 2014) (available at http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/11230298/George-Osborne-I-will-give-SFO-blank-cheque-to-probe-forex-manipulation.html).

[57] Jamie McGeever and Kirstin Ridley, Reuters, *Arrested RBS forex trader named as Paul Nash* (Jan. 8, 2015) (available at http://www.reuters.com/article/2015/01/08/us-forex-rbs-court-idUSKBN0KH1IZ20150108).

[58] Lianna Brinded, International Business Times, *FX Fixing Scandal:  BaFin Pushes Deutsche Bank Probe to Top of List* (Jan. 20, 2014) (available at http://www.ibtimes.co.uk/fx-fixing-scandal-bafin-pushes-deutsche-bank-probe-top-list-1432973).

171.   By May 2014, BaFin had expanded its probe into "all German banks active in currency trading."[59] BaFin's investigators confirmed that they had found "disturbing evidence," that traders had manipulated FX rates, including telephone transcripts and emails "that show traders were asking for higher or lower fixing prices, and counterparts that then dumped, for example €400 million to move markets."

172.   In November 2014, Raimund Roeseler, BaFin's head of banking supervision, reported that BaFin had even found cases of possible criminal activity that were "anything but reassuring. These are possibly criminal acts that could happen because checks failed."[60]

173.   **_The Swiss Competition Commission ("Swiss WEKO")_** is an independent Swiss federal authority responsible for "combating harmful cartels, monitoring dominant companies for signs of anti-competitive conduct, enforcing merger control legislation, and preventing the imposition of restraints of competition."[61]

174.   Around September 2013, the Swiss WEKO launched one of the first investigations into manipulation of the FX market. In March 2014, the Swiss WEKO provided additional details on its ongoing investigations, stating that it was focusing on a total of eight banks, including Defendants Barclays, Citi, Credit Suisse, JPMorgan, RBS, and UBS.[62]   The

---

[59] Eyk Henning, Wall St. J., _Germany's Banking Watchdog Widens Foreign Exchange Probe_ (May 20, 2014) (available at http://www.wsj.com/articles/ SB10001424052702304198504579573700827118172).

[60] Reuters, _Bafin says forex probe shows possible criminal acts_ (Nov. 29, 2014) (available at http://www.reuters.com/article/2014/11/29/fx-investigation-germany-idUSL6N0TJ0A820141129).

[61] Competition Commission, _Welcome to the Competition Commission_ (available at http://www.weko.admin.ch/index.html?lang=en&).

[62] Caroline Copley and Patrick Graham, Reuters, _Swiss, UK watchdogs step up scrutiny on forex trades_ (Mar. 31, 2014) (available at http://www.reuters.com/article/2014/03/31/us- swiss-forex-investigation-idUSBREA2U0EN20140331); David Schafer, Financial Times, _Swiss and_

Swiss WEKO added that "evidence exists that these banks colluded to manipulate exchange rates in foreign currency trades" and reached "anti-competitive agreements to manipulate price rates in foreign exchange trading."

175.   **The Monetary Authority of Singapore ("MAS")** is Singapore's central bank and financial regulatory authority. In October 2013, the MAS announced that it had "been in touch with foreign regulators on the issue of alleged manipulation in the WM/Reuters foreign exchange benchmark rates. We stand ready to assist in their investigations."[63]

176.   **The Australia Securities and Investment Commission ("ASIC")** is an independent Australian government body that enforces financial services laws and regulations. In March 2014, ASIC announced that it was launching an investigation into manipulation of the FX market.[64] A spokesperson stated "[w]e are aware of the reports of international regulatory inquiries on potential misconduct in other jurisdictions in relation to the FX market" and that ''[w]e will conduct our own inquiries in Australia.''

177.   **The New Zealand Commerce Commission** is the government agency responsible for enforcing pro-competition legislation. In March 2014, the New Zealand Commerce Commission announced that it is also investigating manipulation of the FX market.[65]

---

*UK watchdogs step up Forex investigations* (Mar. 31, 2014) (available at http://www.ft.com/cms/s/0/99be70f4-b8ae-11e3-a189-00144feabdc0.html#axzz3VMMdYe4x).

[63] Rachel Armstrong and Kevin Lim, Reuters, *Singapore ready to assist in global currency rigging probe* (Oct. 24, 2013) (available at http://www.reuters.com/article/2013/10/24/markets-fx-rigging-singapore-idUSL3N0IE2XO20131024).

[64] Georgia Wilkins, The Sydney Morning Herald, *ASIC launches investigation into foreign exchange benchmarks* (Mar. 21, 2014) (available at http://www.smh.com.au/business/asic-launches-investigation-into-foreign-exchange-benchmarks-20140320-355wo.html).

[65] The New Zealand Herald, *Commerce Commission launches forex probe* (Mar. 31, 2014) (available at http://www.nzherald.co.nz/business/news/article.cfm?c_id=3&objected=11229637).

178.   At least eight of the Defendants, including JP Morgan, Citi, Goldman Sachs, Barclays, HSBC, UBS, RBS, and Deutsche Bank have disclosed the investigations by regulators in recent regulatory filings.  Citigroup, JPMorgan, Deutsche Bank, UBS, RBS and Barclays, and HSBC have all said they were cooperating with regulators.

### C.      Defendants have Since Terminated, Suspended or Overseen the Departure of Key Employees, and Banned their Traders from Multi-Bank Chat Rooms

179.   Since the media and government regulators began to release information showing that Defendants had colluded to manipulate the FX market, each of the Defendants has overseen the departure of at least one of its key FX employees since late 2013.  Collectively, the Defendants have terminated or suspended *at least 36* FX employees, and seen at least eight other long-time, high-ranking FX personnel leave to reasons such as to "pursue other interests." Defendants have also since banned the use of multi-bank chat rooms by their FX personnel.

180.   *BofA* has suspended or terminated at least one FX employee. In March 2014, BofA suspended Joseph Landes, its head of spot FX trading in Europe, the Middle East, and Africa.[66]

181.   *Barclays* has suspended or terminated at least six foreign exchange employees.[67] In November 2013, Barclays suspended Chris Ashton, the global head of voice spot trading, and a member of the "Cartel" chat room. Barclays also suspended New York-based FX spot

---

[66] Jamie McGeever, Reuters, *Bank of America suspends senior FX trader in London* (Mar. 6, 2014) (available at http://www.reuters.com/article/2014/03/06/us-bank-of-america-suspends-idUSBREA251MZ20140306).

[67] Caroline Binham and Daniel Schafer, Financial Times, *Barclays suspends six foreign exchange traders* (Nov. 1, 2013) (available at http://www.ft.com/intl/cms/s/0/c3675c9a-42f2-11e3-8350-00144feabdc0.html#axzz3WB4A422a).

traders Russell Katz and Jerry Urwin, London-based FX trader Mark Clark, Tokyo-based FX

trader Jack Murray, and at least one unknown Barclays FX employee.

182.   **BNP Paribas** has suspended or terminated at least one FX employee.[68] In March

2014, BNP Paribas suspended Robert de Groot, its head of FX spot trading, and a member of

the Bank of England's Chief Dealers' Sub Group.

183.   **Citi** has suspended or terminated at least three FX employees.[69] Citi suspended

Andrew Amantia, an FX trader in New York, and Anthony John, an FX trader in London. Citi

also terminated its head of European spot trading, Rohan Ramchandani, who was also a

member of the Bank of England's Chief Dealers' Sub Group. In addition, the overall head of

Citigroup's FX operations, Anil Prasad, left the bank in March 2014 to "pursue other

interests."[70]

184.   **Credit Suisse** substantially scaled back its FX trading operations in May 2014

by offering "redundancy packages" to six employees in New York and London.[71] Those

employees include Daniel Wise, the head of spot trading in London, Mark Astley, a director

of FX strategy, Monika Dasani, a London-based FX sales person, and Martin Amann, a New

---

[68] Katie Martin and David Enrich, Wall St. J., *BNP Paribas and Bank of America Suspend Forex Traders* (Mar. 6, 2014) (available at http://www.wsj.com/articles/SB10001424052702304554004579422854231268772).

[69] Liam Vaughan and Gavin Finch, Bloomberg, *HSBC, Citigroup Said to Suspend Traders on Currency Probe* (Jan. 17, 2014) (available at http://www.bloomberg.com/news/articles/2014-01-17/hsbc-says-it-suspended-two-london-foreign-exchange-traders-1-).

[70] Ambereen Choudhury, Bloomberg, *Citigroup Head of Currencies Prasad to Step Down in March* (Feb. 5, 2014) (available at http://www.bloomberg.com/news/articles/2014-02-05/citigroup-head-of-currencies-anil-prasad-to-step-down-in-march).

[71] Julia Verlaine, Bloomberg, *Credit Suisse Trims FX Team as Fixed-Income Unit Shrinks* (May 13, 2014) (available at http://www.bloomberg.com/news/articles/2014-05-13/credit-suisse-trims-fx-team-as-fixed-income-unit-shrinks).

York-based director of FX sales. In addition, in September 2013, Todd Sandoz, the head of

global FX trading stepped down after more than 17 years at Credit Suisse.

185.   **Deutsche Bank** has suspended or terminated at least five FX employees.[72]

Deutsche Bank terminated three FX traders in its New York office: Diego Moraiz, the head of

the emerging markets FX trading desk; Christopher Fahy, an FX trading director; and Robert

Wallden, an FX trading director. DOJ and FBI agents had previously questioned Mr. Wallden

at his New York home about transcripts of an electronic chat where he boasted "about his

ability to influence currency markets."[73]

186.   Deutsche Bank also fired Ezequiel Starobinsky, an FX trader based in Buenos

Aires, Argentina. And Kai Lew, a director of institutional FX sales, was suspended following

an internal investigation. In addition, Christina Binaghi, a New York-based managing director

and head of Latin America FX trading, left the firm in March 2014.

187.   **Goldman Sachs** oversaw the departure of three senior FX executives in 2014:

Steven Cho, the New York-based global head of spot and forward FX trading for G10

currencies; Leland Kim, another partner in the FX trading business; and Mitesh Parikh, the

European head of spot FX trading.[74]

---

[72] Gertrude Chavez-Dreyfuss, Reuters, *Deutsche Bank fires Argentine trader in wake of FX probe* (Feb. 5, 2014) (available at http://www.reuters.com/article/2014/02/05/us-forex-deutsche-argentina-idUSBREA1423620140205).

[73] David Enrich, Katie Martin and Jenny Strasburg, Wall St. J., *FBI Tries New Tactic in Currency Probe* (Nov. 20, 2013) (available at http://on.wsj.com/OIgEmq).

[74] Michael J. Moore, Bloomberg, *Goldman Sachs Currency Traders Cho, Lim Said to Depart* (Feb. 5, 2014) (available at http://www.bloomberg.com/news/articles/2014-02-05/goldman-sachs-currency-traders-cho-lim-said-to-depart).

188.  **HSBC** has suspended or terminated at least two FX employees.[75] In January

2014, HSBC suspended Serge Sarramenga, the head of its G-10 spot FX desk, and Edward

Pinto, an FX trader based in London.

189.  **JPMorgan** has suspended or terminated at least two FX employees.[76] JPMorgan

suspended Richard Usher, its head of G-10 spot trading. Usher was a leader of the "Cartel"

chat room and was a member of the Bank of England's Chief Dealers' Subgroup.  JPMorgan

also suspended FX trader Gordon Andrews, after allegedly finding evidence that he disclosed

trade information to employees at other banks.

190.  **Morgan Stanley** has overseen the departure of at least two high-ranking FX

executives.[77] In March 2014, Steve Glynn, co-head of FX and emerging markets, left the

bank. Glynn had been at Morgan Stanley for 14 years. And in August 2014, Stuart Sopp, the

G10 FX head, resigned from his position after five years with Morgan Stanley.

191.  **RBS** has placed at least six FX employees into a disciplinary process, three of

whom have been suspended.[78] London-based FX traders Julian Munson, Paul Nash, and Ian

Drysdale have been suspended.  And in December 2014, Mr. Nash was arrested and

---

[75] Liam Vaughan and Gavin Finch, Bloomberg, *HSBC, Citigroup Said to Suspend Traders on Currency Probe* (Jan. 17, 2014) (available at http://www.bloomberg.com/news/ articles/2014-01-17/hsbc-says-it-suspended-two-london-foreign-exchange-traders-1-).

[76] Gavin Finch and Suzi Ring, Bloomberg, *JPMorgan Currency Trader Said to Be Suspended for Actions at RBS* (Jan. 14, 2015) (available at http://www.bloomberg.com/news/articles/2015-01-14/jpmorgan-currency-trader-said-to-be-suspended-for-actions-at-rbs).

[77] Reuters, *Morgan Stanley names Falloon as head of Asia Pac fixed income* (Mar. 13, 2014) (available at http://www.reuters.com/article/2014/03/13/morgan-stanley-falloon-idUSL3N0MA30V20140313).

[78] Steve Slater and Jamie McGeever, Reuters, *Six RBS traders could be punished in forex probe* (Dec. 23, 2014) (available at http://uk.reuters.com/article/2014/12/23/uk-rbs-forex-probe-idUKKBN0K116420141223).

criminally changed by authorities as part of the U.K. Serious Fraud Office's FX manipulation investigation.

192.   **UBS** has suspended or terminated at least seven FX employees.[79] UBS suspended Niall O'Riordan, its head of FX trading and a member of the Bank of England's Chief Dealers' Subgroup.  UBS also suspended at least six other FX traders, including New York-based traders Onur Sert and Michael Velardi. In addition, former UBS senior FX trader Matt Gardiner was placed on leave by his current employer, Standard Chartered PLC, where he is the assistant chief FX dealer.

## III.   DEFENDANTS MANIPULATED PRICES FOR FX FUTURES AND OPTIONS ON FUTURES

### A.   <u>Defendants Manipulated Futures Prices Around 10 a.m. Central Time</u>

193.   As detailed above, the results of government investigations and admissions by Defendants' own former employees confirm that Defendants actively colluded to manipulate FX spot prices and benchmark rates, including at and around the key 4 p.m. WM/Reuters Closing Rate fixing period. The court handling a related class action has found that this is a surplus of "direct evidence akin to the 'recorded phone call in which two competitors agreed to fix prices at a certain level.'" *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 1:13-cv-07789-LGS, Dkt. No. 242, at 12 (S.D.N.Y. Jan. 28, 2015).

194.   Prices for FX futures and options move in tandem with prices for FX spot transactions and are linked structurally and closely to each other. By manipulating prices and key benchmarks for spot transactions, Defendants also manipulated the prices for FX futures and options to artificial levels. As major participants in the FX market, Defendants knew that

---

[79] Emily Flitter and Jamie McGeever, Reuters, *UBS suspends U.S.-based forex trader in manipulation probe* (Mar. 28, 2014) (http://www.reuters.com/article/2014/03/28/us-forex-ubs-investigation-idUSBREA2R15T20140328).

their manipulation of FX spot prices necessarily, foreseeably and intentionally caused artificial prices of FX futures and options on futures, to the detriment of market participants, such as Plaintiff.

195.   The prices for FX futures and options on futures are highly dependent upon, and move together with, the FX spot rate. That is because the FX spot rate is a major component of the fair value price of FX futures contracts. Changes in spot prices will thus necessarily and directly impact prices in corresponding futures. The value of options on FX futures, which are directly linked to the prices of the underlying futures contracts, are thus similarly dependent on the underlying spot prices. Numerous academic and authoritative sources have documented this relationship between spot prices and futures prices. *See generally, e.g.*, John Labuszewski, Sandra Ro, and David Gibbs, CME Group, *Understanding FX Futures* (Apr. 22, 2013) (available at https://www.cmegroup.com/education/files/understanding-fx-futures.pdf).

196.   Indeed, in its Orders on Citi, HSBC, JPMorgan, RBS, and UBS, the CFTC observed that "[e]xchange rates in many actively traded CME foreign exchange futures contracts, including the Euro/U.S. Dollar (EUR/USD) futures, the Japanese Yen/U.S. Dollar (JPY/USD) futures, and British Pound Sterling/U.S. Dollar (GBP/USD) futures, ***track rates in spot foreign exchange markets at near parity*** after adjusting for the forward differential, or adding or subtracting 'forward points.'" The CFTC added that "FX benchmark rates, including the WM/Reuters Rates, are used to price a variety of transactions including foreign exchange swaps, cross currency swaps, spot transactions, forwards, options, futures, and other financial derivative instruments."

### B.   Defendants Manipulated Futures Prices Around 2 p.m. Central Time

197.   As set forth above, Defendants are major participants in the FX market, and have admitted to a pattern of collusive and manipulative behavior in the FX market, including specifically by way of using telephone calls, electronic chat rooms, and other forms of communication to coordinate the timing of execution of transactions as to distort the measurement of "the market" during a key benchmarking window.

198.   Defendants' plea deals confirm their willingness, ability, and incentive to carry out a conspiracy to fix prices in the FX market. The data confirms they carried over such willingness, ability, and incentives into trading periods other than the fixing window for the WM/Reuters Closing Rate (4 p.m. London time/10 a.m. Central time). There is no indication that Defendants' conspiracy was confined to spot prices during the 4 p.m. WM/Reuters Closing Rate fixing window.  To the contrary, as a matter of common sense and logic, Defendants used the same methods and means of communication and conspiracy that they have admitted using to influence the FX spot rate to also manipulate other, key FX futures and options benchmark rates, including the CME Daily Settlement Rates, "rollover dates," and "final trading days."

199.   As discussed above, the CME Daily Settlement Rates are another key FX benchmark. They determine, on a daily basis, the cash flows, profits, and losses on FX futures contracts. And they determine, on a regular basis, whether FX options expire in or out of the money. As also discussed above, the CME Daily Settlement Rates are determined by the volume-weighted average price of trades in the thirty-second window of 1:59:30 p.m. and 2:00:00 p.m. Central time.

200.   It is likely Defendants deployed the same tools discussed above at other key periods during the life of FX futures and options. For instance, many futures contracts are closed out prior to expiry on a so-called "rollover date." To "rollover" a position, traders close

out the near-to-expiry contract in advance of expiry and move into a new position in the next

expiring contract. This allows the trader to avoid having to make physical delivery on the initial

contract.

201.   While rollovers could occur at any point a trader wants to, by industry practice in

fact most FX futures roll over around 9:30 a.m. Eastern time (8:30 a.m. Central time) five

business days prior to expiry, with expiry dates coming once a quarter. Like with the

measurement windows for the key benchmarks discussed above, the heightened incentive to

manipulate during this key trading period proved too tempting for Defendants to resist

extending their conspiracy into.

202.   FX futures contracts typically settle on the third Wednesday of March, June,

September, and December, with trading in those contracts typically ending two business days

prior. This is known as the "final trading day." Between 9:15:30 a.m. and 9:16:00 a.m. Central

time on these once-a-quarter days, the final settlement price of FX futures contracts are

determined. This represents yet another moment in time when the incentives to manipulate

were particularly heightened, apart from the daily manipulations in the London Fix (4 p.m.

London time/10 a.m. Central time), the daily manipulations in the CME Daily Settlement Rate

(10 a.m. Central time), and even apart from the quarterly roll-over times (9:30 a.m. Eastern

time/8:30 a.m. Central time) and it is likely that Defendants took advantage to manipulate the

market during these times as well.

## V.   DEFENDANTS' CONDUCT RESTRAINED TRADE, DECREASED COMPETITION, AND ARTIFICIALLY LOWERED PRICES, THEREBY INJURING PLAINTIFF

### A.   Defendants are Horizontal Competitors

203.   Defendants are, and were during the Class Period, horizontal competitors in the FX market, whether it be FX spot transactions, FX futures transactions, or FX options on futures.

204.   In the FX market, Defendants compete against each other in both their capacities as dealers and as direct market participants. For instance, as the primary dealers of FX spot and forward transactions, Defendants compete against each other for customers of FX spot and forward instruments. As dealers, Defendants compete for customers by offering spot and futures transactions at competing terms, including bid/ask spreads.  Defendants also compete against each other by entering FX spot and forward transactions as direct market participants (e.g., as buyers and sellers). In that capacity, Defendants compete with each other, and all other market participants, by seeking profits from taking positions in the FX spot and forwards market.

205.   By way of another example, for FX futures and options on futures, Defendants also compete against each other by entering those transactions as direct market participants. Defendants were supposed to compete with each other, and other market participants, by buying and selling FX futures and options on futures based on their independent view of the competitive market place—not based on information gained and activities carried out as part of a trading bloc with other banks.

206.   In both instances, Defendants were supposed to be competing by seeking the best prices and terms for all FX transactions they entered into.

## B.   Defendants' Manipulation of FX Prices Directly Impacted the Market for FX Transactions

207.   Defendants' conduct constitutes a per se violation of the antitrust laws because of its clear and obvious risk of inflicting anticompetitive impact and economic injury. Defendants

operated as a secretive cartel and engaged in a price-fixing scheme that restricted competition. Defendants' scheme to manipulate prices and benchmark rates directly and immediately impacted the market for FX transactions of all kinds—including spots, forwards, futures, and options on futures. To the extent some of those types of FX transactions may be considered distinct market segments, Defendants' scheme immediately impacted each of those as well.

208.   Instead of acting as competitors, Defendants agreed to restrain trade in order to pursue collective goals and to manipulate the market by collusion and coordination, as described above. Defendants' collusive price fixing was inimical to competition and restrained trade in the affected market (and any applicable market segments).

209.   For instance, as set forth above, Defendants used telephone calls, electronic chat rooms, and other forms of communication to coordinate the timing of execution of transactions as to distort the measurement of "the market" during key times of the trading day. Defendants' collusive conduct warped the interplay of supply and demand. Absent collusion, Defendants would have competed to offer competitive prices by quoting bids and asks to customers at the lowest cost for a given currency in the spot market, and by participating independently as buyers and sellers of futures and options on FX exchanges. All transactions should have been carried out based on free and open competition—not based on joint effort by the market's primary participants to collusively time the execution or non-execution of FX transactions.

210.   All of these acts were undertaken for the purpose of, and had the actual effect of, manipulating prices in the FX market, including of the relevant underlying commodities. The intentional, artificial price movements had a significant impact on all FX transactions, including futures and options on futures. The effects of Defendants' collusive manipulation of the above- described market were purposeful and intended to maximize Defendants' profits.

C.      **Plaintiff, as a Participant in the Market for FX Futures and Options on Futures, Was Injured by Defendants' Collusive Conduct**

211.   Plaintiff was a participant in the market for FX futures and options on futures, and was affected by artificial movements in the prices in the futures market, caused by Defendants' cartel.

212.   As discussed above, the manipulation here was pervasive throughout the Class Period. Plaintiff—who entered into a significant number of FX futures and options transactions during the Class Period—was injured by Defendants' manipulation of futures prices and other benchmark rates in multiple ways.

213.   As alleged herein, the damage to Plaintiff and members of the Class flows from the injury to price competition caused by Defendants.

214.   For example, Plaintiff and members of the Class purchased, sold, settled, and/or rolled over FX futures and options on futures at the same time Defendants were manipulating prices, i.e., around the WM/Reuters Closing Rate fixing window (4 p.m. London time/10 a.m. Central time), around the CME Daily Settlement Rate fixing window (2 p.m. Central time), and/or around the quarterly rollover and final-settlement windows (9:30 a.m. Eastern time/8:30 a.m. Central time on certain days, and 9:15 a.m. Central time, respectively).

215.   At a minimum, Defendants' concerted manipulation of the FX market directly impacted the prices of FX futures and options on futures transacted around these times. Simply put, those that bought when prices were being inflated were harmed because they paid too much. And those that sold when prices were being suppressed were harmed because they received too little. Paying supra-competitive prices is the prototypical example of an antitrust injury, and directly stems from Defendants' collusive behavior.

216.   By way of another example, for Plaintiff and members of the class, manipulation of the CME Daily Settlement Rates directly impacted their cashflows, because of the margin requirements. Thus, even class members who merely held FX futures on a day of manipulation were harmed, because their margin accounts were reduced by too much, or increased by too little, as a direct result of Defendants' price manipulations.

217.   The injury to Plaintiff and members of the Class are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

218.   Defendants' anticompetitive conduct had severe adverse consequences to competition in that Defendants artificially ensured advantageous market movements in the FX market—including the segments for FX spot, forwards, futures, and options and futures—by exchanging confidential customer information and agreeing to concerted traded strategies, such as front running, banging the close, and painting the screen, based on aggregate customer order flow information. Under the facts alleged herein, Plaintiff and members of the Class could not escape such conduct because Defendants are collectively the dominant FX spot dealers and major participants in the market for FX spot and futures transactions.

219.   As a direct, foreseeable, and proximate result of Defendants' unlawful collusion and overt acts alleged herein, Plaintiff and members of the Class have been injured in their business and property, in amounts that are presently undetermined.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

220.   During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion, as alleged herein, from Plaintiff and other members of the Class.

221.   Due to Defendants' efforts to conceal their collusive conduct, and their campaign to avoid its detection, Plaintiff could not, through the exercise of reasonable diligence, have

learned of facts indicating that Defendants were colluding to prevent the entry of exchanges

into the market at least until June 12, 2013, when Bloomberg first reported of the possibility

that Defendants were rigging currency rates. As a result of Defendants' fraudulent

concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's

claims have been tolled.

222.   Defendants' conspiracy was by its nature secretive and self-concealing.

Defendants used non-public methods of communication, such as private chatrooms and text

messages, to conceal their agreements to manipulate FX prices. Moreover, Defendants actively

and jointly undertook trading strategies designed to conceal their collusive conduct, such as

"painting the screen" or executing phony transactions, so that even diligent investors could not

detect Defendants' manipulation of exchange rates.

223.   Further, Defendants used false pretenses to collude, executing agreements to rig

FX prices while operating under the guise of legitimate corporate communications. For

instance, as alleged above, Defendants were members of the Bank of England's London

Foreign Exchange Joint Standing Committee, and using the cover of their membership, as part

of the chief dealers' subgroup, Defendants met and reached agreements to manipulate the

prices. These meetings concerned trading strategies that were in no way connected to legitimate

work of the subgroup. When concerns were privately raised at a Bank of England meeting over

possible manipulation for WM/Reuters Closing Rates, according to chatroom transcripts

reviewed by people that spoke with *Bloomberg*, the Defendants acted jointly and through

chatrooms to disguise their conduct.

224.   While regulators such as the United Kingdom Financial Conduct Authority, the

U.S. Department of Justice criminal and antitrust divisions, the U.S. Commodity Futures

Trading Commission, the U.S. Federal Reserve, the New York Attorney General's Office, the Office of the Comptroller of the Currency, the Swiss Financial Market Supervisory Authority, the Swiss competition authority WEKO, the Hong Kong Monetary Authority, the Monetary Authority of Singapore, and the Dutch regulator AFM have all opened investigations, all of these investigations commenced after the publication of the Bloomberg article in June 2013.

225.   Even when Bloomberg first exposed collusion among the Defendants using chatrooms and instant messaging services, Defendants did not break ranks, but instead engaged in ongoing efforts to keep their collusion hidden. In response to inquiries from the reporter, the banks refused to comment and offered phony justifications for their communications.

226.   The first antitrust action on behalf of a class of persons engaged in FX transactions was filed on November 1, 2013.  The first antitrust action filed specifically on behalf of a group of persons transacting in FX futures and options on futures was filed on February 23, 2015.

227.   Throughout the Class Period, Plaintiff regularly monitored his investments and conducted due diligence to try to avoid being harmed by financial misconduct. Practically speaking, there were limits to what could be done, given that so much of the foreign exchange market was shrouded in secrecy due to Defendants' conduct.

228.   Further, reasonable due diligence could not have uncovered Defendants' conspiracy because (1) Defendants' trades and trading strategies are not public information; and (2) the bilateral, non-exchange traded nature of the spot trades further obscures what Defendants were, and are, doing at any particular time.

229.   As a result of the self-concealing nature of the price-fixing conspiracy, the active steps taken by Defendants to fraudulently conceal their conspiracy and the lack of public

information concerning material aspects of the conspiracy, the statute of limitations was tolled

for Plaintiff's claim.

## CLASS ACTION ALLEGATIONS

230.   Plaintiff brings this action on behalf of himself and the other members of the

Class as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who, beginning as early as January 1,
> 2003 and continuing to the present, held FX futures or options on
> FX futures whose daily cash flows (such as a margin account)
> were calculated based on any key FX futures benchmark, or who
> bought, sold, settled, or otherwise entered or exited foreign
> exchange futures and options of futures at or around the time of
> the setting of any key FX futures benchmark, with such
> benchmarks including, without limitation:  (1) the setting of the
> daily WM/Reuters Closing Rates at 4 p.m. London time; (2) the
> setting of the daily CME Daily Settlement Rates, at 2 p.m. Central
> time; (3) the setting of quarterly futures final settlement prices on
> final trading days (typically the third Wednesday of March, June,
> September, and December), between 9:15:30 a.m. and 9:16:00
> a.m. Central time or who bought cash currency at this time to
> deliver under the futures expiry; and (4) the quarterly futures
> "rollover" periods (typically five business dates prior to quarterly
> expiration dates), at 9:30 a.m. Eastern time.
>
> Excluded from the Class are Defendants and their employees,
> affiliates, parents, subsidiaries, and co-conspirators, whether or
> not named in this Complaint, and the United States government.

231.   Plaintiff believes that there are at least hundreds, if not thousands, of members of

the Class as described above, making the Class so numerous and geographically dispersed that

joinder of all members is impracticable.

232.   There are questions of law and fact common to the Class that relate to the

existence of the conspiracy alleged, and the type and common pattern of injury sustained as a

result thereof, including, but not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the foreign exchange market in the United States in violation of the Sherman Act;

b.   The identity of the participants in the conspiracy;

c.   The duration of the conspiracy;

d.   The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and the other members of the Class;

f.   Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the other members of the Classes; and

g.   The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

233.   Plaintiff's FX transactions were actually impacted by Defendants' manipulations, and Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is a member of the Class; has claims that are typical of the claims of the Class members; and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

234.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

235.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

236.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that number individual actions would engender. The Class is readily definable and is one for which records can be readily ascertained, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as the ones asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**VIOLATION OF 15 U.S.C. § 1 AGREEMENT IN RESTRAINT OF TRADE**

237.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

238.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

239.   During the Class Period, Defendants entered into a series of agreements to reduce competition amongst themselves by coordinating trading strategies for the purpose of manipulating FX prices for various currency pairs.

240.   This conspiracy to manipulate FX prices caused injury to Plaintiff and other members of the Class because they were deprived of the benefit of transacting in a market where prices (as well as key benchmarks related thereto) were determined by free and open competition.  Transactions that would have been spread out over the course of the day—or never happened at all—were instead bunched around the fixing window. Other transactions in the opposite directions were withheld, or delayed. Still other transactions were invented merely for the purpose of continuing the scheme. All this was done in a successful, collusive attempt to move prices in the FX market, including for futures and options on futures. Plaintiff and other members of the Class bought when prices were artificially high during these periods of extreme distortion, sold when prices were artificially low during such periods of extreme distortion, and throughout were also harmed when their daily cash flows were impacted by margin calculations that were based on artificial prices. For many reasons, then, Plaintiff and members of the Class were harmed by Defendants' conspiracy.

241.   The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the foreign exchange market, including for FX futures and options on futures. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conduct.

242.   As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and other members of the Class have suffered injury to their business and property throughout the Class Period.

243.   Plaintiff and other members of the Class are entitled to treble damages for the violations of the Sherman Act alleged herein.

**SECOND CAUSE OF ACTION**

**VIOLATION OF 7 U.S.C. §§ 1 et seq.**
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**INCLUDING CFTC RULE 180.2**

244.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

245.   By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2 adopted under the CEA ("Rule 180.2") and manipulated the prices of exchange-traded FX futures and options on futures, and the price of the commodity underlying these instruments, causing these prices to be artificial during the Class Period.

246.   Defendants knew that their wrongful acts would cause prices to be artificial during the Class Period.

247.   Defendants intended that their wrongful acts would result in prices being artificial during the Class Period.

248.   Defendants' and their co-conspirators' trading and other activities alleged herein constitute market manipulation of prices of exchange-traded FX futures and options on futures, and prices of the commodity underlying these instruments, in violation of Sections 6(c)(3), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(3), 13(a) and 25(a), and Rule 180.2.

249.   Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

250.   Plaintiff and others who transacted in exchange-traded FX futures and options on futures during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, et seq., and Rule 180.1.  Even members of the Class who merely held FX futures and options on futures during the Class Period were themselves harmed, because Defendants' manipulations resulted in interim transactions (such as margin calculations) to also be carried out based on artificial and unlawful prices. In all cases, Plaintiff and members of the Class as a direct result of the artificial and unlawful prices were injured and suffered damages.

## THIRD CAUSE OF ACTION

### VIOLATION OF 7 U.S.C. §§ 1 et seq.
### EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE 180.1

251.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

252.   By their intentional misconduct, from August 15, 2011 through the present, Defendants and their co-conspirators each violated Sections 6(c)(1) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(1), 13(a)(2), and CFTC Rule 180.1 adopted under the CEA ("Rule 180.1") and caused prices of exchange-traded FX futures and options on futures, and prices of the commodity underlying these instruments, to be artificial during the Class Period.

253.   Defendants' and their co-conspirators' trading and other activities alleged herein constitute market manipulation of prices of exchange-traded FX futures and options on futures, and prices of the commodity underlying these instruments, in violation of Sections 6(c)(1), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(1), 13(a) and 25(a), and Rule 180.1.

254.   Defendants knew that their wrongful acts would cause prices to be artificial during the Class Period.

255.   Defendants intended that their wrongful acts would result in prices being artificial during the Class Period.

256.   Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

257.   Plaintiff and others who transacted in exchange-traded FX futures and options on futures during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, et seq., and Rule 180.1.  Even members of the Class who merely held FX futures and options on futures during the Class Period were themselves harmed, because Defendants' manipulations resulted in interim transactions (such as margin calculations) to also be carried out based on artificial and unlawful prices. In all cases, Plaintiff and members of the Class as a direct result of the artificial and unlawful prices were injured and suffered damages.

<u>FOURTH CAUSE OF ACTION</u>

**VIOLATION OF 7 U.S.C. §§ 1 *et seq*.**
**FALSE REPORTING IN VIOLATION OF THE COMMODITY EXCHANGE ACT**

258.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

259.   By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(1) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(1) and 13(a)(2) and caused prices of exchange-traded FX futures and options on futures, and the price of the commodity underlying these instruments, to be artificial during the Class Period.

260.   In violation of CEA Sections 6(c)(1) and 9(a)(2), Defendants and co-conspirators

78

caused to be delivered for transmission false, misleading, or inaccurate reports concerning order and trade information that affect the price of FX futures and options on futures, i.e., false reports concerning market information or conditions that affected or tended to affect prices in interstate commerce. Defendants and co-conspirators did so either knowingly, intentionally, or with reckless disregard of the fact that such reports were false, misleading, or inaccurate.

261.   Defendants knew that their wrongful acts would cause prices to be artificial during the Class Period.

262.   Defendants intended that their wrongful acts would result in prices being artificial during the Class Period.

263.   Plaintiff and others who transacted in exchange-traded FX futures and options on futures during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq.*, and Rule 180.1.  Even members of the Class who merely held FX futures and options on futures during the Class Period were themselves harmed, because Defendants' manipulations resulted in interim transactions (such as margin calculations) to also be carried out based on artificial and unlawful prices. In all cases, Plaintiff and members of the Class as a direct result of the artificial and unlawful prices were injured and suffered damages.

### FIFTH CAUSE OF ACTION

### VIOLATION OF 7 U.S.C. §§ 1 *et seq.*
### PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

264.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

265.   Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §

2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

266.   Plaintiff sustained and is entitled to actual damages for the violations of the CEA alleged herein.

## SIXTH CAUSE OF ACTION

### VIOLATION OF 7 U.S.C. §§ 1 *et seq.*
### AIDING AND ABETTING LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

267.   Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

268.   Defendants and their co-conspirators knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's, and their co-conspirators', FX manipulations, and willfully intended to assist these manipulations, which resulted in FX futures and options on futures pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), ¶ 25(a)(1).

269.   Plaintiff sustained and is entitled to actual damages for the violations of the CEA alleged herein.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.   That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representatives, and that Plaintiff's counsel be appointed as Class counsel for the Class;

B.   That the unlawful conduct alleged herein be adjudged and decreed to violate

Section 1 of the Sherman Act;

        C.      That the Court award Plaintiff and other members of the Class damages against Defendants, in an amount to be trebled in accordance with Federal antitrust laws, plus interest;

        D.      That the Court award Plaintiff and the other members of the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

        E.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by jury.

Dated:  June 2, 2015

COHEN MILSTEIN SELLERS & TOLL
PLLC

J. Douglas Richards (JDR-6038)
Michael Eisenkraft (ME-6974)
George Farah (GF-3472)
88 Pine Street
14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com
gfarah@cohenmilstein.com

Manuel John Dominguez
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 833-6575
dominguez@cohenmilstein.com

Daniel H. Silverman
1100 New York Ave., NW
Suite 500
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
dsilverman@cohenmilstein.com

*Attorneys for Plaintiff*